**STATE of Minnesota, Respondent,**

v.

**David Michael TSCHEU, Appellant.**

**No. A06–2239.**

Supreme Court of Minnesota.

Dec. 31, 2008.

Rehearing Denied Feb. 3, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Donald F. Ryan, Crow Wing County Attorney, Brainerd, MN, for respondent.

Mark D. Nyvold, St. Paul, MN, for appellant.

## OPINION

GILDEA, Justice.

Following a jury trial in Crow Wing County District Court, appellant David Michael Tscheu was convicted of first-degree murder in connection with the death of Bonita Thoms. Tscheu filed a direct ap-

peal to this court, arguing that the district court erred (1) when it denied his motion for judgment of acquittal at the close of the State's case, (2) by permitting his prior convictions to be used for impeachment, and (3) by admitting hearsay testimony. We affirm.

The evidence at trial established that Bonita Thoms was last seen alive on Friday, February 25, 2005. She went to work that day, and records from a local grocery store confirm that she made purchases at the store on February 25, presumably during her lunch break. Records from Thoms's employer indicate that she left work at approximately 3:35 p.m. A witness testified to seeing Thoms in her car, apparently on her way home, sometime between 3:30 and 4:35 p.m. and when she was approximately 5 miles from her home.

Later that evening, Thoms's stepson J.B. tried to reach Thoms by telephone, but was unsuccessful. J.B. telephoned Thoms again the morning of Saturday, February 26, but he again failed to reach her. J.B. wanted to tell Thoms that he was coming to her residence in Aitkin, Minnesota, to pick up a camper that he had stored on her property.

J.B. arrived at Thoms's home at approximately 3:30 p.m. on Saturday, February 26. When he arrived, J.B. saw Thoms's red Buick LeSabre parked in the driveway. He also noticed that water was running on the ground outside of the house, and that Thoms's dog, which normally slept indoors, was outside and had been outside long enough for ice crystals to form on his face. J.B. entered Thoms's home through the closed but unlocked front door; he called out to Thoms, but received no response. J.B. then heard the shower running. When he opened the bathroom door, J.B. found Thoms dead in the bathtub. He then called 911.

Crow Wing County Deputy Sheriff Donald Downie arrived at Thoms's home around 4:08 p.m. in response to the 911 call. Downie testified that there were no signs of fresh forced entry to the front door, and that other doors to the home were still locked when he arrived. In the bathroom he noted that an "older" shower curtain, which had been repaired with masking tape that had yellowed, was intact and three-quarters closed. A pair of women's underwear was hanging from the shower rod and three pairs were on the floor. Thoms was laying on her right side in the tub and was nude except for her brassiere and a wrist watch, which had been pushed up onto her left hand. The shower was spraying cold water onto Thoms's head. The bathtub was filled with water to the overflow drain, and most of Thoms's head, including her mouth and nose, were submerged. Thoms's eyeglasses were floating in the water. Downie turned off the shower and drained the tub. Downie then photographed the scene, and photographs he took were introduced into evidence at trial.[1]

Downie also testified that he saw a newspaper from February 25 that appeared unread, and several perishable food items on the counter in Thoms's kitchen. These items matched those Thoms pur-

---

1. Downie admitted at trial that he "could have done a better job" of handling the crime scene. He stated that he should not have drained the water in the bathtub before photographing the scene and that he should not have allowed J.B. to spend the night at Thoms's residence after the body was removed, but before the investigation was complete. The defense also offered expert testimony establishing that investigators did not handle the crime scene so as to preserve evidence.

chased at the grocery store on February 25, and the State offered testimony that Thoms normally would have immediately placed the perishable items into the refrigerator upon returning home. Although the house was searched, Thoms's purse and keys, usually kept on the kitchen counter, were never located.

One of Thoms's daughters testified that because Thoms heated her home with a wood-burning stove, and it had been very cold that winter, Thoms would often take a bath to warm up after arriving home from work. Thoms's other daughter testified that Thoms would remove her watch and eyeglasses before bathing, and that Thoms generally only showered if she wanted to wash her hair, which she did every other day.

In addition to the background evidence about Thoms and the crime scene evidence, the State also offered testimony from Dr. Janis Amatuzio who performed the autopsy. Dr. Amatuzio determined that Thoms died sometime between 3:18 and 9:18 p.m. on Friday, February 25, as a result of asphyxia from drowning. She concluded that Thoms's death was a homicide based on bruise patterns on the body, the way the body was found, and the significant amount of water in Thoms's stomach and lungs. Dr. Amatuzio noted that Thoms was taking a number of medications—including a blood thinner that caused her to bruise easily—but she ruled out cardiac arrhythmia as the cause of death.

According to Dr. Amatuzio, the pattern of injuries on the body suggested that Thoms was restrained in the bathtub by pressure on her left leg and a hand on the back of her neck, causing her to drown. Those injuries included a cluster of round bruises located just above Thoms's left knee, consistent with fingertip pressure; subcutaneous hemorrhaging in the strap muscles of the posterior neck, suggesting a restraint hold; burst blood vessels in both eyes, indicating neck compression; a bruise on the left side of Thoms's jaw; and circular bruises—two on Thoms's left front arm and three below her left shoulder—that were consistent with fingertip pressure. Dr. Amatuzio testified that all of these injuries were inflicted perimortem, meaning at or around the time of death.

Dr. Amatuzio testified that other injuries on the body suggested that Thoms was involved in a struggle: a scrape or abrasion behind and below her left ear, indicating contact with an oval-shaped or linear object, such as a kitchen countertop; a superficial bruise on her left elbow, possibly caused by a fall against a blunt surface; a linear mark running from Thoms's left hip and down her thigh, suggesting impact with a straight object such as a piece of furniture or a door; bruises on her left upper chest and back; and three round bruises in the front and one bruise in the back of Thoms's right upper arm, likely caused by thumb and fingertip pressure and consistent with a restraint hold. Dr. Amatuzio testified that these struggle-related injuries were inflicted perimortem.

Finally, regarding bruising on Thoms's body, Dr. Amatuzio described defensive injuries that included subcutaneous bleeding in the knuckle of the left third finger, indicating that Thoms was involved in an altercation or tried to push someone away, and a small bruise on the outside of Thoms's left wrist, suggesting that Thoms was grabbed or tried to ward off a blow. The defensive injuries were suffered perimortem.

Dr. Amatuzio also conducted a sexual assault exam as part of the investigation.

There were no signs of injury to the vagina, perineum, rectum, or anus. Hemorrhoids around the outside of the anus were also uninjured. When asked whether it would be unusual for someone's anal cavity not to show signs of injury after forced intercourse, Dr. Amatuzio testified that the anus may or may not show evidence of tears or injury, depending on the degree and rapidity of the force used. She also noted that hemorrhoids could cause anal intercourse to be uncomfortable, but that they would not cause any obstruction to the anus.

Semen was found inside Thoms's rectum that matched Tscheu's DNA. DNA analyst Kristine Deters testified that, statistically speaking, such a match would not be expected to occur more than once among the world's population. Semen consistent with Tscheu's DNA was also found on Thoms's perineum. Deters estimated that 99.95% of the general population could be excluded as contributors to the perineal deposit.[2]

No semen was found in Thoms's vagina. Deters was asked about the possibility of seminal drainage from the vagina into the rectum after vaginal intercourse. She testified that typically vaginal intercourse causes an abundant amount of sperm in the vaginal cavity and only occasional sperm in the rectal cavity.

Finally, regarding the DNA evidence, the State showed that a partial male DNA profile was obtained from Thoms's fingernail clippings. Statistically speaking, 0.9 to 7.4% of the population, depending on ethnic background, could be expected to be included in the group having this particular profile. This profile was tested against other known samples of male individuals who submitted DNA samples to the Bureau of Criminal Apprehension (BCA) during the course of the investigation. Except for Tscheu and his father, all known samples were excluded.[3]

The State's evidence also explained the investigation of Tscheu. Tscheu was initially identified as a person of interest because Thoms's stepson identified him as someone who had visited Thoms's residence in the past. Deputy Downie first contacted Tscheu about Thoms's death on March 17, 2005. At that time, Tscheu said that the last time he had seen Thoms was shortly before August 2004. The record reflects that on the day of Thoms's death, Tscheu and his father drove together to a construction site in Crosslake. Tscheu's timesheet indicated that he worked 5.5 hours on that day. Tscheu's father told police that he and Tscheu visited a Fleet Farm after work to purchase automobile parts. Tscheu told police that he then went home and changed the engine in his van that night. Downie estimated that it would take about 27 minutes to drive from the job site in Crosslake to Thoms's residence in Aitkin.

When asked about Thoms's death, Tscheu told police that he heard from his mother or a man named B.B. that Thoms had been strangled, but B.B. did not corroborate Tscheu's account. Tscheu also told Deputy Downie that he had never had sex with Thoms. Phone records did not indicate any calls between Thoms and

---

**2.** As part of the investigation, samples from 12 other people termed "persons of interest" were examined and all 12 were excluded as DNA contributors to the semen found in Thoms's rectum and perineum.

**3.** There was no argument or evidence that Tscheu's father was a possible third-party perpetrator.

Tscheu, and nothing belonging to Thoms was found at the Tscheu residence. Tscheu became the chief suspect after the semen found in Thoms's rectum matched his DNA database profile on file with the BCA. Tscheu voluntarily provided a second DNA sample, which confirmed the match.

The defense theory was that Tscheu had consensual sex with Thoms the night before her death, and that a third-party perpetrator murdered her. As potential third-party perpetrators, the defense identified two of Thoms's stepsons, Michael and Shawn, and M.H., the half-brother of Thoms's neighbor. Shawn resided in California and no evidence was presented that he was in Minnesota on the date of the crime. Michael could not have committed the murder because he was in prison at that time.[4]

In support of the theory that M.H. committed the murder, the defense called J.J., whose sister, Michelle, was dating M.H. J.J. testified that she saw M.H. and Michelle around 2:30 p.m. on Friday, February 25 in Emily, Minnesota, which is approximately 16 miles away from Thoms's home in Aitkin. According to J.J., M.H. planned to collect some money from Thoms that day. She described M.H.'s mood as "angry" and "furious" and said that around 3:40 p.m. she saw him get into a four-door, dark red- or maroon-colored car. Another defense witness said that she saw a four-door, dark sedan—"either black or dark blue or possibly maroon"—in

Thoms's driveway at approximately 5:05 p.m. on February 25.[5] The State contended that because its evidence showed that M.H. picked up a wire transfer in Crosslake, which was 26 minutes from Thoms's residence, at 4:47 p.m., he could not have been at her residence by 5:05 p.m., when the dark sedan was reportedly seen in Thoms's driveway. Moreover, the State offered evidence showing that M.H. was using a pickup truck in the weeks before the murder.

The defense also presented testimony from Dr. Janice Ophoven, a forensic pathologist, who said that although she agreed that Thoms died from drowning, she could not say with certainty that homicidal violence caused the drowning. In particular, Dr. Ophoven testified that bleeding in the eyes was not definitive evidence of suffocation. She also testified that Thoms could have died suddenly from her enlarged heart, which could not be detected during an autopsy.

Finally, Tscheu testified on his own behalf and denied that he killed or sexually assaulted Thoms. He said that he drove himself to work on Thursday, February 24, and went to Thoms's home that night to make sure she had firewood. Tscheu claimed that after chopping the wood, he and Thoms talked and then had consensual sex. Tscheu testified that no one knew about their ongoing relationship, because "[i]t was our business." He also testified that he worked on his van and never left home the night of Thoms's death.[6] The

---

4. Michael and Shawn provided DNA samples to police during the investigation and their samples did not match the sample found on Thoms's body.

5. The same witness who reported seeing Thoms on her way home from work also testified that he saw her vehicle, which was

red, in her driveway at approximately this time on February 25.

6. Tscheu's parents testified that he was at home that night, but they did not account for all of his time.

State impeached Tscheu with his prior statements to police that he had never had sex with Thoms and that he had not seen her for several months before her murder.

Following his arrest, a grand jury indicted Tscheu for first-degree murder while committing first-degree criminal sexual conduct placing the victim in fear of great bodily harm in violation of Minn.Stat. § 609.185(a)(2) (2006) (Count I), and first-degree murder while committing first-degree criminal sexual conduct causing personal injury in violation of the same statute (Count II). The jury found Tscheu not guilty of Count I and guilty of Count II. The district court convicted Tscheu and sentenced him to life in prison. This direct appeal follows.

## I.

■ We turn first to Tscheu's argument that the district court erred when it denied his motion for judgment of acquittal made at the close of the State's case-in-chief. Tscheu argues that the motion should have been granted because the evidence in this case—which was purely circumstantial— was not sufficient to support the guilty verdict.[7]

## A.

When we review whether the evidence is sufficient to sustain a conviction, we determine "'whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged.'" *State v. Race*, 383 N.W.2d 656, 661 (Minn.1986) (quoting *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981)). Tscheu argues that the evidence was insufficient because the State's case was entirely circumstantial and that the State did not eliminate all "inferences other than that [of] guilt." To support this formulation of the issue, Tscheu cites *Bernhardt v. State*, 684 N.W.2d 465, 479–81 (Minn.2004), and *State v. Jones*, 516 N.W.2d 545, 549 (Minn.1994). But these cases do not stand for the proposition that the State's evidence must exclude *all* inferences other than that of guilt. The State's obligation is to exclude all *reasonable* inferences other than guilt. *State v. Hughes*, 749 N.W.2d 307, 312–13 (Minn.2008) (discussing *Bernhardt*).

■ Stated another way, circumstantial evidence is sufficient to sustain a conviction when "all the *circumstances proved* [are] consistent with the hypothesis that the accused is guilty and inconsistent with any *rational* hypothesis except that of his guilt." *State v. Johnson*, 173 Minn. 543, 545, 217 N.W. 683, 684 (1928) (emphasis added). The phrase "circumstances proved" does not mean "every circum-

---

7. Tscheu argues that we must consider only the evidence presented during the State's case-in-chief and that this evidence was so lacking as to require that his motion be granted. But we have held that where a defendant chooses to introduce evidence after his motion for judgment of acquittal has been denied, we consider the "whole record" and not just the evidence produced by the State. *State v. Currie*, 274 Minn. 160, 162, 143 N.W.2d 58, 59 (1966); *State v. Traver*, 198 Minn. 237, 238, 269 N.W. 393, 393–94 (1936) ("[I]f, after denial of his motion to dismiss, defendant elects to proceed further and present evidence on the issue or issues and further evidence is received, whether by defendant's witnesses or by the state, the question of the sufficiency of the evidence to sustain the verdict or decision is then to be determined on appeal by a consideration of all the evidence presented in the case."). In examining whether the evidence was sufficient to support the conviction, we therefore are not limited to just that evidence introduced by the State.

stance as to which there may be some testimony in the case"; rather, it refers only to those "circumstances as the jury finds proved by the evidence." *Id.* at 545, 217 N.W. at 684. There may well be "testimony on behalf of the defendant as to inconsistent facts and circumstances, not conclusively proved, and which the jury may have a right to and do reject as not proved." *Id.* at 545, 217 N.W. at 684. And even though verdicts based on circumstantial evidence may warrant stricter scrutiny, we still construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses. *State v. Asfeld,* 662 N.W.2d 534, 546 (Minn.2003); *see also Race,* 383 N.W.2d at 662 (finding that circumstantial evidence, even though conflicting, was sufficient to support conviction).[8]

■ Questions of which witnesses or conflicting evidence to believe are for the jury even in cases built entirely on circumstantial evidence, and [i]nconsistencies in the state's case or possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable. *State v. Ostrem,* 535 N.W.2d 916, 923–24 (Minn.1995) (holding that circumstantial evidence was sufficient to convict even though the record contains evidence of two different factual scenarios because the jury was free to disbelieve[ ] Ostrem's alibi defense); *see also State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002). Therefore to succeed on his challenge to the verdict, Tscheu may not rely on mere conjecture. *Asfeld,* 662 N.W.2d at 544 (internal quotation marks omitted). He must instead point to evidence in the record that is consistent with a rational theory other than guilt. *Ostrem,* 535 N.W.2d at 923. We turn next to an analysis of the specific evidentiary deficiencies Tscheu identifies to determine if these deficiencies are consistent with a rational theory other than Tscheu's guilt.[9]

## B.

Tscheu claims that the evidence was insufficient as to several of the elements

---

8. The United States Supreme Court has rejected the argument that a jury should be instructed that circumstantial evidence must exclude every reasonable hypothesis other than that of guilt. *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The Court explained that testimonial and circumstantial evidence are intrinsically the same and that in both instances a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. *Id.* The Court's holding in *Holland* has triggered a line of cases that ultimately led the Eighth Circuit to hold that when considering a motion for judgment of acquittal, the evidence need not exclude every reasonable hypothesis except guilt. *See United States v. Bredell,* 884 F.2d 1081, 1082 (8th Cir.1989); *United States v. Shahane,* 517 F.2d 1173, 1177 (8th Cir.1975). Although we have agreed that a jury need not be instructed that circumstantial evidence must exclude every reasonable hypothesis other than that of guilt, *State v. Turnipseed,* 297 N.W.2d 308, 313 (Minn.1980) (citing *Holland,* 348 U.S. at 139–40, 75 S.Ct. 127), when assessing sufficiency of the evidence, we have said that the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt, *Jones,* 516 N.W.2d at 549.

9. We disagree with the concurrence's suggestion that we are departing from our "sufficiency standard of review for convictions based solely on circumstantial evidence." We apply here the standard we have applied for decades, and the focus of that inquiry is whether, when the evidence is examined as a whole with appropriate deference given to the jury, there is a reasonable hypothesis that Tscheu was innocent. *E.g., State v. Johnson,* 173 Minn. 543, 545, 217 N.W. 683, 684 (1928).

necessary to prove first-degree murder and that therefore his conviction must be reversed. To establish first-degree murder, the State was required to prove that Tscheu caused Thoms's death while committing first-degree criminal sexual conduct. *See* Minn.Stat. § 609.185(a)(2) (providing that whoever "causes the death of a human being while committing ... criminal sexual conduct in the first ... degree with force or violence" is guilty of murder in the first degree); *see also State v. Harris*, 589 N.W.2d 782, 792 (Minn.1999) (noting that we look to "the manner in which a crime was committed, including the type of wounds the victim sustained and the condition and posture of the victim's body, [as all of this evidence] can support a conclusion that the victim was killed while being sexually assaulted"). And to prove first-degree criminal sexual conduct, the State had to prove that nonconsensual sexual penetration was accomplished by force or coercion and accompanied by personal injury to Thoms. Minn.Stat. § 609.342, subd. 1(e)(i) (2006) ("A person who engages in sexual penetration with another person ... is guilty of criminal sexual conduct in the first degree if ... the actor causes personal injury to the complainant, ... [and] the actor uses force or coercion to accomplish sexual penetration."). Personal injury is defined as "bodily harm," Minn.Stat. § 609.341, subd. 8 (2006), and includes physical pain or injury, Minn.Stat. § 609.02, subd. 7 (2006). Only a "minimal amount of physical pain or injury" is necessary in order "to satisfy the definition of 'bodily harm.'" *State v. Jarvis*, 665 N.W.2d 518, 522 (Minn.2003) (holding that evidence that the defendant drugged the victim before he raped her sufficiently impaired her physical condition in order to satisfy the definition of "bodily harm"); *see also State v. Bowser*, 307 N.W.2d 778,

779 (Minn.1981) (stating that the victim's testimony that she "felt considerable pain" when the defendant "first penetrated her" and evidence of a laceration of the victim's hymen sufficed to uphold a conviction for first-degree criminal sexual conduct); *State v. Gunn*, 299 N.W.2d 137, 137 (Minn. 1980) (affirming a conviction for first-degree criminal sexual conduct based on evidence that the defendant struck the victim on the head and then threatened additional violence in order to coerce her into having sexual intercourse).

Tscheu argues that the evidence on three elements was insufficient. Specifically, he contends that the circumstantial evidence was insufficient to prove that (1) the sexual penetration was nonconsensual, (2) he caused personal injury to Thoms, or (3) he accomplished the sexual penetration through force or violence. Tscheu argues that the evidence could equally support findings that Tscheu and Thoms engaged in consensual sexual penetration and that Thoms sustained all of her injuries when a third party drowned her. But Tscheu's argument fails to acknowledge that "[e]ven in cases based on circumstantial evidence, ... we have consistently recognized that the jury is in the best position to evaluate the evidence, and we 'will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture.'" *Asfeld*, 662 N.W.2d at 544 (quoting *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998)).

With respect to the element of consent, the evidence was sufficient to prove that Tscheu had nonconsensual sex with Thoms. Specifically, the evidence demonstrated that Thoms had bruising on the back of her right arm that was consistent with the imprint of a thumb and bruising on the front of that arm consistent with imprints of fingers. These imprints sup-

ported the inference that Thoms was forcibly restrained from behind. The State also showed that DNA consistent with Tscheu's profile was found in Thoms's fingernail clippings, supporting the inference that Thoms and Tscheu struggled before her death. Finally, the evidence indicated that Tscheu sexually penetrated Thoms's anus, and that Tscheu lied to police about not having had sex with Thoms. This evidence, when considered as a whole, supports the conclusion that the sex was not consensual.

For his part, Tscheu testified that the sex was consensual. But his testimony was impeached with his prior statement to police that he had never had sex with Thoms and the jury was free to disbelieve him. *See Race*, 383 N.W.2d at 662 (Significant inconsistencies in appellant's statements to authorities substantially diminished the credibility of his assertion of the existence of two rafts, so the jury had substantial grounds to doubt the veracity of [his] story. (internal quotation marks omitted)). Tscheu's testimony that the sex was consensual therefore does not mean that the evidence was not sufficient to support the conclusion that Thoms did not consent to the sexual penetration. *See Asfeld*, 662 N.W.2d at 545 (finding evidence sufficient to sustain conviction and stating that defendant cannot now claim that the state failed to meet its burden simply because the jury did not believe him).

With respect to whether the penetration was accomplished with force or violence and accompanied by personal injury, the evidence was also sufficient to support these elements.[10] The evidence supports the inference that Thoms was interrupted when she was tending to her dog and putting groceries away after she came home from work on Friday, February 25. This interruption caused Thoms's dog to be left outside and perishable items to remain on the kitchen counter. The evidence also supports the finding that Thoms was involved in a struggle around the time of her death. This evidence included bruising behind Thoms's ear and on her elbow, which injuries were consistent with falling against the kitchen countertop, and evidence of defensive injuries on her left wrist and a finger on her left hand. Because DNA consistent with Tscheu's profile was found in Thoms's fingernail clippings, the jury could reasonably conclude that Thoms struggled with Tscheu. Moreover, the evidence of the bruising on the front and back of Thoms's right arm supports the inference that Thoms was forcibly restrained from behind. Finally, the evidence supports the conclusion that, because of the hemorrhoids, Thoms suffered discomfort during the anal penetration.

But, Tscheu argues, the evidence also supports the rational hypothesis that a third-party perpetrator was the person who struggled with Thoms and drowned her. The evidence, however, proved that the DNA found under Thoms's fingernails and the semen found on her body belonged to Tscheu. And while it is theoretically possible that someone else was involved in a struggle with Thoms, there is no physical

---

10. Tscheu argues that the absence of injury to Thoms's intimate areas means there is reasonable doubt as to his guilt of criminal sexual conduct in the first degree. But the statute does not require that injury be inflicted to the victim's intimate areas and neither have our cases. *See State v. Profit*, 591 N.W.2d 451, 469 (Minn.1999) (stating that "[t]he fact that no seminal fluid or vaginal injuries were found is not dispositive" of the question of whether the defendant committed first-degree criminal sexual conduct).

evidence in the record to provide reasonable support for this hypothesis. *See Ostrem*, 535 N.W.2d at 923 (noting that a successful challenge to the sufficiency of the evidence must be based on evidence in the record). As discussed more fully above, we will not reverse a conviction, even one grounded only in circumstantial evidence, based on mere conjecture or the possibility of innocence when the evidence shows such possibility is unreasonable. *See, e.g., id.*[11]

Tscheu's hypothesis that he engaged in consensual vaginal sex with Thoms and that Thoms was subsequently attacked and murdered by a different person is not reasonable. When we assume as we must that the jury believed the State's witnesses and disbelieved conflicting evidence, a reasonable jury could have found that the evidence proved the following circumstances: Tscheu forcibly restrained Thoms from behind to facilitate forced, nonconsensual penile penetration of her anus,[12] Thoms struggled with Tscheu and suffered bruising as a result, and Thoms experienced discomfort during the penetration because of her hemorrhoids. When the evidence is fully assessed, it is clear that the evidence is sufficient to support Tscheu's conviction, and Tscheu's largely

conjectural theory of innocence is not reasonable. We therefore hold that the district court did not err in denying Tscheu's motion for judgment of acquittal.

## II.

■■ We turn next to Tscheu's argument that he is entitled to a new trial because the district court erroneously allowed use of his prior felony convictions for impeachment without proper notice to him and without the State requesting a pretrial hearing on the issue.[13] Tscheu argues that *State v. Wenberg*, 289 N.W.2d 503 (Minn.1980), requires that the State give notice of its intent to cross-examine a defendant under Minn. R. Evid. 609(a) and request a pretrial hearing to obtain a ruling on the admissibility of impeachment evidence. We review a "district court's ruling on the admissibility of prior convictions for impeachment of a defendant" for abuse of discretion. *State v. Swanson*, 707 N.W.2d 645, 654 (Minn.2006).

■ Regarding Tscheu's claim that the State did not give proper notice, we presume that "the defense will not be surprised at trial if the state offers evidence of a relevant crime for which the defendant has already been prosecuted."[14]

11. To hold otherwise would be to do precisely what the concurrence cautions must not be done—"'leap logical gaps in proof offered and draw unwarranted conclusions based on probabilities of low degree.'" *People v. Kennedy*, 47 N.Y.2d 196, 417 N.Y.S.2d 452, 391 N.E.2d 288, 291 (1979) (quoting *People v. Benzinger*, 36 N.Y.2d 29, 364 N.Y.S.2d 855, 324 N.E.2d 334, 335 (1974)).

12. The jury was not required to believe Tscheu's suggestion that he had engaged in consensual vaginal penetration with Thoms and that gravity had caused his semen to fully drain into her anal cavity. This is especially true where the DNA expert testified that she had never seen a case where semen fully

drained from a vagina into an anal cavity, and where the forensic pathologist testified that that forcible penetration could be accomplished without tearing Thoms's anus or rupturing her hemorrhoids.

13. Tscheu does not contend that the district court failed to analyze the admissibility of the convictions under *State v. Jones*, 271 N.W.2d 534 (Minn.1978). Accordingly, we will not discuss this issue.

14. Tscheu does not refer to the procedural safeguards we adopted in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965), and *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967), regarding the admissibility of other-

*State v. Arndt,* 264 N.W.2d 637, 638 (Minn. 1978). But the State nonetheless must give advance notice of its intent to introduce prior conviction evidence if the defendant requests discovery. Minn. R.Crim. P. 9.01, subd. 1(5). Tscheu requested discovery of certain evidence, but did not include his criminal record in the request. Although the State did not give separate notice regarding its intent to introduce Tscheu's prior convictions for impeachment, Tscheu had actual notice from the State's *Spreigl* notice that the State intended to offer evidence·of the convictions at trial. Moreover, defense counsel stated that he knew about the evidence the State intended to offer as *Spreigl* evidence and that he "was aware of the convictions." Defense counsel conceded that Tscheu had prior felony convictions within 10 years that would be admissible for impeachment, and the district court found the State's motion to use the convictions "unlikely to be a surprise" to defense counsel. Based on this record, we conclude that Tscheu has not shown that he suffered any prejudice due to the lack of a separate notice. *See Arndt,* 264 N.W.2d at 639.

With regard to the hearing, a defendant is entitled to have the district court make a determination of the Rule 609(a) issue "outside the presence of the jury before the accused decides whether to testify." *Fallin,* 540 N.W.2d at 520. We have said that "[t]he appropriate procedure under the Rules of Evidence is for the prosecutor to request a hearing outside the jury's presence, *preferably* before trial at the omnibus hearing, on the matter of whether any defense witness, including the defendant, may be impeached by prior convictions." *Wenberg,* 289 N.W.2d at 504–05 (emphasis added).

The district court heard arguments regarding the Rule 609(a) issue after Tscheu's direct testimony. Defense counsel objected to the timing of the hearing as improper, but said, "I wouldn't even be opposed to the Court allowing him to indicate that he has, say, three prior felony convictions ... [I] would not oppose using the convictions, just the statement of what they were convictions for." The district court admitted the convictions for impeachment, and then allowed defense counsel to re-open direct examination in order to inquire about the convictions. Defense counsel then asked Tscheu about the convictions. The State did not ask any questions about them. The court gave limiting instructions to the jury immediately after the evidence was introduced and again before closing arguments as to how the convictions could properly be used. While the better practice is the one we described in *Wenberg,* 289 N.W.2d at 504–05, given the protective steps the district court took here to minimize prejudice to Tscheu, we hold that the court did not abuse its discretion when it allowed the use of Tscheu's prior convictions for impeachment.

crime evidence pursuant to Minn. R. Evid. 404(b). "Those safeguards include written pretrial notice specifying the bases for admission of the evidence, a requirement that the proponent of the evidence prove the other crime by clear and convincing evidence, and a requirement that the trial court give a cautionary or limiting instruction at the time the evidence is admitted and as part of the final instructions." *State v. Fallin,* 540 N.W.2d 518, 520 (Minn.1995), *superseded on other grounds by rule,* Minn. R. Evid. 608(c) (2006), *as recognized in State v. Fields,* 730 N.W.2d 777, 779 (Minn.2007); Minn. R.Crim. P. 7.02. But the following specific exception exists in Rule 7.02 for prior convictions: "The notice need not include offenses for which the defendant has been previously prosecuted or those that may be offered in rebuttal of the defendant's character witnesses...."

## III.

 Finally, we turn to Tscheu's argument regarding the admission of two out-of-court statements [15]: first, testimony from BCA Agent Eric Jaeche recounting that a snowplow driver told Jaeche that the driver had seen a box-style Jeep or van—the same type owned by Tscheu—in Thoms's driveway around the day of her murder; and second, testimony by Deputy Downie regarding the date of sale and registration of M.H.'s red Corsica.[16] Tscheu argues that this evidence should not have been admitted because it was inadmissible hearsay and that its admission violated his constitutional right to confrontation. Tscheu concedes that he did not object during trial to the introduction of the now-complained-of testimony. Failure to object to the admission of evidence generally constitutes a waiver of the right to appeal on that basis. *See State v. Williams*, 525 N.W.2d 538, 544 (Minn. 1994). But we may consider an error not objected to at trial if there was (1) error, (2) the error was plain, and (3) the error affected the defendant's substantial rights; that is, "if [the error] had the effect of depriving the defendant of a fair trial." *Id.* If these three prongs are met, we "then assess[ ] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998); *see also State v. Pilot*, 595 N.W.2d 511, 518 (Minn.1999) (noting that

for plain error to exist, "the trial error must have been so clear under applicable law at the time of conviction, and so prejudicial to the defendant's right to a fair trial, that the defendant's failure to object—and thereby present the trial court with an opportunity to avoid prejudice—should not forfeit his right to a remedy" (internal quotation omitted)). We apply the plain error analysis to constitutional challenges and to evidentiary questions. *See State v. Martin*, 695 N.W.2d 578, 582–83 (Minn.2005) (applying plain error analysis to Confrontation Clause issue); *State v. Manthey*, 711 N.W.2d 498, 504 (Minn.2006) (applying plain error analysis to hearsay question).

### A. The Snowplow Driver

 During its case-in-chief, the State presented testimony by Agent Jaeche regarding a snowplow driver who passed Thoms's home the day of her death. Jaeche testified that he asked the driver to go by Thoms's residence, familiarize himself, and try to recall any suspicious activity or vehicles in the area on the date of her death. Jaeche testified that the driver said that sometime around February 25, "he couldn't be exactly sure on the date, . . . he believe[d] that he observed either a box-style Jeep or a box-style van in the driveway of Bonita Thoms." Tscheu drove a silver Dodge minivan at that time. The evidentiary value of the statement at issue was to place Tscheu at Thoms's home on or around February 25.

---

15. The State argues that the prosecutor had an "agreement" with defense counsel to allow Deputy Downie and Agent Eric Jaeche to testify using hearsay declarations obtained during the investigation. Tscheu denies any such agreement and asks this court to strike the portion of the State's brief discussing the supposed agreement. At oral argument, the State cited a transcript reference to an "agreement," but this reference does not sup-

port the State's assertion of a wholesale agreement regarding the introduction of hearsay testimony. Tscheu's motion to strike is therefore granted.

16. As discussed above, the defense identified M.H., the half-brother of Thoms's neighbor, as a possible third-party perpetrator.

Tscheu argues that the admission of Agent Jaeche's testimony about what the snowplow driver told him violates the Confrontation Clause. We agree. The Sixth Amendment guarantees the accused the right to confront the witnesses against him. U.S. Const. amend. VI. The Supreme Court held in *Crawford v. Washington* that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The critical question under *Crawford* is whether the statement at issue is testimonial. *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (stating that nontestimonial out-of-court statements, "while subject to traditional limitations upon hearsay evidence, [are] not subject to the Confrontation Clause").

We have recognized that a statement prepared for litigation is testimonial. *State v. Caulfield,* 722 N.W.2d 304, 309–10 (Minn.2006) (finding that a BCA report prepared for litigation was testimonial). Agent Jaeche obtained the snowplow driver's statement with the purpose of providing evidence at trial. The statement was testimonial for purposes of the Confrontation Clause and, therefore, inadmissible. *See id.* at 309 (noting that the "critical determinative factor" in confrontation clause analysis is whether statement was "prepared for litigation"). Under the first two *Griller* prongs, we hold that the admission of the snowplow driver's testimony was error that was plain.[17]

The third *Griller* prong requires that the error affect Tscheu's substantial rights. 583 N.W.2d at 741. This prong is satisfied if the defendant meets his "heavy burden" to show that the error was prejudicial and affected the outcome of the case. *Id.*[18] Considering the vague detail regarding the date the snowplow driver observed the Jeep or van in Thoms's driveway, and Tscheu's own testimony that he visited Thoms at her home the night before her death, we hold that the verdict was surely unattributable to this error. Because Tscheu has not met his burden to prove that the error affected his substantial rights, the claim as to the snowplow driver is not properly before us. *See id.* at 740.

*B.M.H.'s Vehicle*

In response to defense testimony that M.H. was seen getting into a dark red or maroon, four-door car on Feb-

---

17. Admission of the statement was also plain error under the Minnesota Rules of Evidence because it was hearsay that did not fall within an exception. *See Manthey,* 711 N.W.2d at 504 (noting that hearsay may not be admitted unless it fits within an exception).

18. Citing *Caulfield,* 722 N.W.2d 304, Tscheu argues that "[t]he constitutional harmless-error standard applies to Confrontation Clause violations addressed under the plain error rule," and that he is therefore entitled to a new trial unless it can be determined beyond a reasonable doubt that the verdict was surely unattributable to the errors. But in *Caulfield*

the defendant objected to the introduction of the BCA report at issue and we were not applying the plain error doctrine on appeal. *Id.* at 307 ("Caulfield objected to the admission of the report based on the United States Supreme Court's ruling in *Crawford.*"). Nevertheless, the State does not specifically ask us to apply a standard other than that articulated by Tscheu, under which we examine whether the verdict can be said to be surely unattributable to the errors. For purposes of this case, we therefore apply this higher standard to assess prejudice under the third prong.

ruary 25, and that, around 5:05 p.m. on February 25, a neighbor saw a dark sedan—"either black or dark blue or possibly maroon 4–door"—in Thoms's driveway, the State presented rebuttal testimony by Deputy Downie. He testified that after hearing defense testimony,

> [he] checked the motor vehicle records in the state computer for [M.H.]. And it showed a red Corsica, which was the vehicle that I was aware from dealing with [M.H.] previously that he was currently driving. It showed that the transaction—or the transfer date for that vehicle was 4/27 of 2005. And I confirmed that the previous owner of that vehicle sold that vehicle to [M.H.] on 4/27 of '05, and followed him to the Department of Motor Vehicles on that same date to make sure it was transferred.

Two statements are contained in this answer: (1) the motor vehicle transfer record and (2) confirmation by the previous owner of the sale and registration of the Corsica.

We look first at the motor vehicle transfer record to determine if its admission was an error that was plain, and we conclude that it was not. This record was not prepared for purposes of litigation and, therefore, it is not testimonial. Accordingly, we hold that the admission of Downie's testimony as to the content of this record was not an error that was plain, and that this issue therefore is not properly before us.[19]

■ Deputy Downie's testimony regarding the statement by the previous owner of M.H.'s red Corsica, however, violated the Confrontation Clause because the statement was gathered for purposes of litigation. The testimony was also inadmissible hearsay. The district court therefore committed error that was plain when it admitted the testimony. But this testimony was cumulative of the testimony regarding the motor vehicle transfer record. In addition, the fact that ownership of the red Corsica did not transfer to M.H. until 2 months after the murder does not mean that M.H. was not driving it on the day of the murder. The defense theory was not that M.H. owned the red Corsica on February 25. Rather, the defense theory was that M.H. was seen driving "a vehicle similar to the one" allegedly seen in Thoms's driveway that day. Our review of the record confirms that the verdict was not attributable to this error. We therefore hold that Tscheu did not meet his burden to show that the error is properly before us for review.

Affirmed.

MAGNUSON, C.J., and DIETZEN, J., not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

MEYER, Justice (concurring).

## CONCURRENCE

I concur in the affirmance of Tscheu's conviction but write separately because the majority has incorrectly applied Minnesota's standard of review for when a conviction is based solely on circumstantial evidence. By giving the State the benefit of

---

19. This record likely would have been admissible under the business or public records exceptions, Minn. R. Evid. 803(6), (8). In the absence of an objection, the State was not given the opportunity to establish the admissibility of the transfer record under these exceptions.

all inferences from the evidence, the majority has essentially eliminated our traditional sufficiency review standard. Nevertheless, when properly evaluated under our traditional standard, I would conclude that the evidence was sufficient to establish guilt of the offense of which Tscheu was convicted.

The relevant facts, briefly stated, are these. On February 26, 2005, at around 3:00 p.m., J.B. and two of his children arrived at the Crow Wing County cabin of Bonita Thoms to pick up a camper that he stored on her property. J.B. had called the night before around 6:55 p.m. to let Thoms know he was coming. No one answered, so he left a message. J.B.'s father was Thoms's second husband, before he passed away some 10 years earlier. When J.B. arrived, he noticed water flowing in the area of the septic system and Thoms's dog covered with ice crystals. The dog normally stayed inside. After knocking on the door and receiving no answer, J.B. entered the cabin. He heard the shower running and approached the bathroom, calling out Thoms's name. He opened the bathroom door and saw a foot sticking out of the faucet end of the bathtub. He peeked around the shower curtain and saw Thoms, the shower still running, the bathtub full, and her head mostly submerged under water.

J.B. called 911 and went outside to shovel snow as he waited for assistance. Deputy Donald J. Downie, responding from the sheriff's office located in Brainerd, arrived within an hour, talked to J.B., and then entered the cabin. There was no sign of fresh forced entry, and the lights were off. The deputy entered the bathroom, shut off the shower, which was cold at the time, and drained the bathtub. He noted that the water had been set for a warmer temperature, that the room appeared to have been humid for quite some time and that the floor was wet. Thoms was lying on her right side, nude except for a bra, and her wristwatch was pushed down onto the base of her hand. Her eyeglasses were also in the bathtub.

As the deputy was taking photographs in the area of the body, J.B. told the deputy that he couldn't find Thoms's purse or car keys. The deputy then decided to take photographs of the entire cabin. In the kitchen, on the countertop, there was an angel food ring, a block of pepper jack cheese, two tubs of whipped topping, a sack of puppy chow, and a daily newspaper that appeared to have been unread. The bed in the bedroom was made, and there was no sign of a struggle in the house. The primary source of heat for the cabin was a wood-burning stove in the living room; and because the cabin was chilly, J.B. started a fire while the deputy was still there. They never found the purse or car keys. At some point the death investigator arrived, and the body was transported to the morgue in Coon Rapids. The death was considered nonsuspicious, but required further investigation. Meanwhile, J.B. was given permission to spend the weekend at the cabin with his children. While there, they closed the cabin down, draining the water and changing the locks.

On March 1, 2005, the deputy received a preliminary medical examiner's report concluding that the cause of Thoms's death was asphyxia from drowning in an undetermined manner. During the autopsy protocol, the medical examiner had conducted a sexual assault examination, according to Bureau of Criminal Apprehension (BCA) procedures, which included clipping the fingernails and taking swabs of the vagina, perineum, and anal cavity,

all samples of which were sealed and sent to the BCA. The sheriff's office opened an investigation with BCA assistance, and the decision was made to start "from square one," canvassing the neighborhood and interviewing friends, relatives, and other people in Thoms's life. On March 17, 2005, law enforcement interviewed Tscheu, a relative by marriage. Thoms's third husband was his uncle, one of his uncle's sons was his best friend, and he had been to the cabin many times. Thoms's third husband (Tscheu's uncle) passed away in June 2004. Tscheu told the deputy that he last saw Thoms in August 2004, and that he heard that she had been strangled.

During the investigation, law enforcement learned that on February 25, 2005, Thoms worked from 6:54 a.m. until 3:35 p.m. and that she went grocery shopping over the lunch break, purchasing the items found on her kitchen counter. Law enforcement identified the clothing Thoms wore that day from the store's surveillance system and collected those items from her cabin.

In June 2005, the BCA informed law enforcement investigators that the BCA had obtained a DNA profile from a sperm cell fraction of the anal swabs taken during the autopsy. At that point, law enforcement began collecting biological specimens for DNA testing from persons of interest and forwarded the specimens to the BCA. None of the DNA profiles obtained from the specimens collected from persons of interest matched the DNA profile obtained from the sperm cell fraction. In a subsequent search of Minnesota's offender DNA database, the BCA obtained a "hit," or match, of Tscheu's DNA profile with the DNA profile from the sperm cell fraction.

On September 23, 2005, law enforcement re-interviewed Tscheu, who repeated that he had last seen Thoms in August 2004. When asked if he ever had sex with her, he said "no." Tscheu was also asked for a biological specimen for DNA testing, which he provided. The DNA profile obtained from Tscheu's specimen matched the DNA profile from the sperm cell fraction.

Tscheu was indicted by grand jury for first-degree murder while committing first-degree criminal sexual conduct (personal injury) with force or violence and first-degree murder while committing first-degree criminal sexual conduct (fear of great bodily harm) with force or violence. At Tscheu's trial, in addition to evidence related to the investigation, Thoms's family members testified that when Thoms returned home from work, as a matter of routine, she would let her dog Ben out, lay her purse and keys on the counter, and put her groceries away. Although she would leave a propane heater on for Ben during the day, if the cabin was cold, she would start a fire in the wood-burning stove or take a bath to warm up. It was "really cold" that winter, and she was having difficulty "getting warmed up." They also testified that she had a heart condition, for which she took Coumadin, and that she did bruise easily.

The medical examiner who conducted the autopsy, Dr. Janis Amatuzio, testified that the cause of Thoms's death was asphyxia from drowning and that the manner of death was homicide.[1] The estimated time of death was 18–24 hours before

---

1. The medical examiner used the term "homicidal violence" on the death certificate, a nonspecific term for death caused by violent activity of another, because she did not want to put a more specific term in a public document, particularly during an ongoing investigation.

Thoms was found, or sometime between 3:18 p.m. and 9:18 p.m., on February 25. Dr. Amatuzio concluded that death would not have occurred from an accidental fall or an arrhythmia because of the amount of water in the airways, lungs and stomach, which indicated no loss of consciousness. Dr. Amatuzio was aware of Thoms's medications, including Coumadin, which can cause excess or easy bruising. Nevertheless, Dr. Amatuzio was of the opinion that patterns of injury, in the nature of perimortem bruising, were consistent with Thoms having been manually restrained in the bathtub, causing her to drown. Dr. Amatuzio guided the jury through a PowerPoint presentation of the death scene, autopsy photographs, and diagrams to explain her findings and opinion that the manner of death was homicide.

Dr. Amatuzio also described the sexual assault examination, part of the autopsy protocol, that included sterile swabbing of the anus, perineum, and vagina. She observed no signs of injury to these areas. She observed hemorrhoids around the outside of the anus but no injury. When asked what impact this could have on anal intercourse, she said that she would anticipate that the presence of hemorrhoids could cause that activity to be more uncomfortable but that it would not cause obstruction to the anus. As for the absence of injury, she said it "may or may not be unusual" in a situation of forced intercourse. When asked if she had an opinion regarding anal intercourse in this case, Dr. Amatuzio stated that based on BCA testing, Thoms had some sort of contact with another individual that caused the deposition of that individual's DNA in her anus.

At the close of the State's case, Tscheu moved for judgment of acquittal, arguing that the evidence was insufficient to sustain a conviction of the charged offenses. The motion was denied. Tscheu then presented several witnesses, including experts in criminal investigation and forensic pathology, and also testified on his own behalf. Tscheu testified that sometime after his uncle (Thoms's husband) passed away, Thoms asked him to help her split firewood; and then one thing led to another, and they ended up having sex. He said that they had consensual vaginal sex on Thursday, February 24, and that he spent Friday night after work and all day Saturday at his parents' home replacing the engine in one van with the engine from another van. He testified that he did not see Thoms on Friday and denied having anything to do with her death.

The jury found Tscheu not guilty of first-degree murder while committing first-degree criminal sexual conduct (fear of great bodily harm) with force or violence. The jury found him guilty of first-degree murder while committing first-degree criminal sexual conduct (personal injury) with force or violence, and he was committed to the custody of the Commissioner of Corrections for the mandatory life term without possibility of release.[2]

## I.

The majority states that "even though verdicts based on circumstantial evidence may warrant stricter scrutiny, we still construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." This review standard is akin to

---

**2.** Both of the charged offenses carry the mandatory term of life without possibility of release. Minn.Stat. § 609.185(a)(2) (2006); Minn.Stat. § 609.106 (2006).

the Eighth Circuit Court of Appeals' approach. *E.g., United States v. Reed,* 297 F.3d 787, 789 (8th Cir.2002) (evaluating a conviction based on strictly circumstantial evidence "in the light most favorable to the government" and giving "the government the benefit of all inferences that reasonably may be drawn from the evidence" (internal quotation marks omitted)). This is not a correct application of Minnesota's sufficiency review standard when a conviction is based solely on circumstantial evidence. While we give deference to the jury's evaluation of weight and credibility issues, unlike the Eighth Circuit, we assess the rationality of the inferences from the evidence and whether they establish guilt beyond a reasonable doubt. By giving nearly complete deference to the jury's resolution of conflicting inferences of fact, the majority has effectively eliminated our traditional standard of review.

### A.

In Minnesota, in assessing the sufficiency of the evidence, "we make a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Brown,* 732 N.W.2d 625, 628 (Minn. 2007). "But, when a conviction is based solely on circumstantial evidence, that evidence must be consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt. In such cases the circumstantial evidence must do more than give rise to suspicion of guilt; it must point unerringly to the accused's guilt." *State v. McArthur,* 730 N.W.2d 44, 49 (Minn.2007) (citations and internal quotation marks omitted).

Minnesota's traditional circumstantial evidence standard incorporates the burden of proof in sufficiency review:

Circumstantial evidence will not sustain conviction of a crime unless the sum of reasonable inference therefrom is "consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt." That proposition is founded upon the presumption of innocence and its demand that guilt be proved beyond a reasonable doubt. "If any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises." *State v. Johnson,* 173 Minn. 543, 545, 217 N.W. 683, 684 (1928); *State v. Larson,* 207 Minn. 515, 292 N.W. 107 (1940).

*State v. Kaster,* 211 Minn. 119, 121, 300 N.W. 897, 899 (1941). The *Kaster* court, in reversing an arson conviction, accepted the State's evidence but made an independent evaluation of the inferences derived from the circumstantial evidence and whether they established guilt beyond a reasonable doubt. *Id.* at 121, 300 N.W. at 899; *see also McArthur,* 730 N.W.2d at 50 (affirming murder conviction following independent evaluation of circumstantial evidence); *State v. Jones,* 516 N.W.2d 545, 549 (Minn. 1994) (reversing assault conviction following independent evaluation of circumstantial evidence); *State v. Loss,* 295 Minn. 271, 281, 204 N.W.2d 404, 410 (1973) (affirming manslaughter conviction following independent evaluation of circumstantial evidence).

Historically, courts recognized the difference between direct and circumstantial evidence. The rational hypothesis standard for evaluating circumstantial evidence was derived from *Commonwealth v. Webster,* 59 Mass. (5 Cush.) 295 (1850). In that case, the defendant was charged with murder in a prosecution based entirely on

circumstantial evidence. *Id.* at 310. The court described the value of circumstantial evidence, noting that it was a medium of proof often "leading to inferences and conclusions as strong as those arising from direct testimony." *Id.* at 311. The court also noted disadvantages in that "a jury has not only to weigh the evidence of facts, but to draw just conclusions from them; in doing which, they may be led by prejudice or partiality, or by want of due deliberation and sobriety of judgment, to make hasty and false deductions." *Id.* at 312. The court advised that "great care and caution ought to be used in drawing inferences from proved facts." *Id.* To that end, the court set out the following rule:

> [T]he circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty, that the accused, and no one else, committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis.

*Id.* at 319. Courts throughout the country, federal and state, adopted the *Webster* rule as a jury instruction to guide the jury in evaluating circumstantial evidence. Irene Merker Rosenberg & Yale L. Rosenberg, *"Perhaps What Ye Say is Based Only on Conjecture"—Circumstantial Evidence, Then and Now,* 31 Hous. L.Rev. 1371, 1392 (1995).

Over a century later, in *Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1954), a unanimous Supreme Court determined that in circumstantial evidence cases, a jury instruction on reasonable doubt obviated the need for an additional rational hypothesis instruction.[3] The federal courts, bound by *Holland,* thereafter abandoned the rational hypothesis instruction and also the rational hypothesis review standard. *E.g., United States v. Francisco,* 410 F.2d 1283, 1286 (8th Cir.1969) (abandoning rational hypothesis appellate review standard). Although we followed the *Holland* rule, eliminating the jury instruction in *State v. Turnipseed,* 297 N.W.2d 308, 313 (Minn. 1980), we retained the traditional rational hypothesis review standard. *E.g., McArthur,* 730 N.W.2d at 49.

Cases based on circumstantial evidence require careful review because of the " 'danger legitimately associated with circumstantial evidence—that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree.' " *People v. Kennedy,* 47 N.Y.2d 196, 417 N.Y.S.2d 452, 391 N.E.2d 288, 291 (1979) (quoting *People v. Benzinger,* 36 N.Y.2d 29, 364 N.Y.S.2d 855, 324 N.E.2d 334, 335

---

**3.** The *Holland* court believed that a special jury instruction would be confusing because testimonial evidence is no different from circumstantial evidence. *Holland,* 348 U.S. at 140, 75 S.Ct. 127. There is, however, a distinction between the two categories: "With regard to the former, the jury must determine whether the particular assertion is true, whereas in the latter case, the jury must not only decide whether it is true, but also whether guilt logically can be inferred from such evidence." Rosenberg & Rosenberg, *supra,* at 1411.

(1974)); *cf. State v. Waltz,* 237 Minn. 409, 416, 54 N.W.2d 791, 796 (1952) (stating that "where circumstantial evidence consists in reasoning from a minor fact or series of minor facts to establish a principal fact, the process is fatally vicious if the circumstances, from which an attempt is made to deduce a conclusion of guilt, depends upon speculation and conjecture"). Minnesota's rational hypothesis review standard "allow[s] the appellate court to oversee whether the jury's inferences from circumstantial evidence were in fact rational and sufficient to establish proof beyond a reasonable doubt." Rosenberg & Rosenberg, *supra,* at 1415. "[N]either the reasonable doubt charge nor the counterpart, any-rational-trier-of-fact appellate review standard comes to grips with the separate issue addressed by use of the reasonable hypothesis of innocence test at the trial and appellate levels, namely, the proper evaluation of circumstantial evidence." *Id.* at 1420. Given the lack of a jury instruction on the evaluation of circumstantial evidence, I believe it imperative that we retain our traditional rational hypothesis standard of review.

### B.

Although the majority's sufficiency review standard includes the words "rational hypothesis," by giving nearly complete deference to the jury's resolution of conflicting inferences of fact that may be drawn from the evidence, the majority has virtually eliminated our traditional sufficiency standard of review for convictions based solely on circumstantial evidence. Under the majority's view, a conviction based on circumstantial evidence will not be disturbed unless there are no rational inferences of guilt in the evidence. The majority draws support for crediting all inferences in favor of the State from *State v. Asfeld,* 662 N.W.2d 534 (Minn.2003), and *State v. Race,* 383 N.W.2d 656 (Minn.1986). In each case we gave deference to the jury's evaluation of witness credibility, but I read neither as crediting all other inferences in favor of the State. *Asfeld,* 662 N.W.2d at 546; *Race,* 383 N.W.2d at 662.

In circumstantial evidence cases, "the ultimate determination of guilt is based also on inferences from the evidence." Rosenberg & Rosenberg, *supra,* at 1416. If the majority's view is correct, meaning that we have abandoned our venerable sufficiency review standard in which we make an independent evaluation of the rationality of the inferences and whether they establish guilt beyond a reasonable doubt, then we should at least be forthright in making that known. And if, on appeal, we are not going to make an independent evaluation, then perhaps we should revisit *Turnipseed* to consider cautionary instructions so that the jury will be advised that circumstantial evidence must exclude every rational hypothesis except that of guilt. *See* 297 N.W.2d at 313. As for Tscheu's appeal, I would conclude that when evaluated in accord with our traditional standard, the evidence was sufficient to support the conviction.

### II.

Tscheu challenges the sufficiency of the evidence regarding the identity of the perpetrator. The State's evidence included testimony that there were no signs of fresh-forced entry into Thoms's cabin, that Tscheu's DNA was found in Thoms's anal cavity, and that all other persons of interest had been excluded. In addition, Tscheu testified that he had been to the cabin many times, that he had consensual sex with Thoms, and that he lied to law enforcement about it. He also said he had no reason to harm Thoms, did not sexually assault her, and did not kill her. On cross-

examination, Tscheu admitted that when law enforcement executed a search warrant at his home, they found no communications of any sort or "anything" to indicate the existence of an ongoing romantic relationship; and he admitted that nothing was found in Thoms's cabin to that effect either. A verdict of guilty cannot properly be based solely on the jury's disbelief of a defendant's denial of the charges. Nevertheless, the jury may " 'use its disbelief to supplement the other evidence against him' adduced by the government." *United States v. Aulicino,* 44 F.3d 1102, 1114 (2d Cir.1995) (quoting *United States v. Stanley,* 928 F.2d 575, 577 (2d Cir.1991)). I would conclude that the evidence submitted at Tscheu's trial, and the justifiable inferences that may be drawn from that evidence, established that Tscheu was responsible for the death of Thoms.[4]

Tscheu also contends that the evidence was insufficient to establish that he caused Thoms's death while committing first-degree criminal sexual conduct (causing personal injury) with force or violence.[5] The felony murder rule may apply if " 'the "fatal wound" was inflicted during the same "chain of events" [between the felony and the killing] so that the requisite time, distance, and causal relationship between the felony and killing are established.' " *State v. McBride,* 666 N.W.2d 351, 365

(Minn.2003) (quoting *State v. Russell,* 503 N.W.2d 110, 113 (Minn.1993)); *see* 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.5(f) (2d ed.2003).

There was testimony that if Thoms's cabin was cold when she returned home from work, she would start a fire in the wood-burning stove or take a bath to warm up; that it was "really cold" that winter; and that at around the same time the day after she died, while Officer Downie was at the cabin, J.B. started a fire because it was cold. Thoms's shoes were found in her bedroom closet, her jacket was hanging in the entry closet, clothing that she had on the day she died was in the bathroom hamper and underwear was on the bathroom floor. The drain to the bathtub was found engaged, the shower running, and the water set for a warmer temperature. The medical examiner testified that Thoms had a curvilinear mark running from her left hip to her thigh, suggesting impact with a door, and bruising on her left wrist and third finger, indicating an altercation and defense injuries to ward off a blow or push someone away. Thoms was manually restrained in the bathtub, causing her to drown; and Tscheu's DNA was in her anal cavity. Thoms's dog Ben, who meant "everything to her," was outside.

I believe that the inferences that may reasonably be drawn from this evidence

---

**4.** The majority concludes that Tscheu's hypothesis of a third-party perpetrator was not reasonable. In *State v. Ostrem,* 535 N.W.2d 916, 923 (Minn.1995), we said that in challenging a conviction based on circumstantial evidence, appellant "must point to evidence in the record that is consistent with a rational theory other than guilt." But the ultimate determination we make on appeal is whether the inferences derived from the circumstantial evidence are rational and establish guilt beyond a reasonable doubt: " 'If any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises.' " *Kaster,* 211 Minn. at 121, 300 N.W.

at 899 (quoting *Johnson,* 173 Minn. at 545, 217 N.W. at 684).

**5.** Minn.Stat. § 609.185(a)(2) (2006) (providing that whoever "causes the death of a human being while committing ... criminal sexual conduct in the first ... degree with force or violence" is guilty of first-degree murder); Minn.Stat. § 609.342, subd. 1(e)(i) (2006) ("A person who engages in sexual penetration with another person ... is guilty of criminal sexual conduct in the first degree if ... the actor causes personal injury to the complainant ... [and] the actor uses force ... to accomplish sexual penetration....").

are that Thoms was interrupted while she was preparing to warm up in the bathroom; that an altercation ensued, causing injury; and that sexual penetration, restraint in the bathtub, and death occurred in relatively short order. It is true, as Tscheu points out, that the bathroom was small, items in the area of the bathtub appeared undisturbed, and there was no injury to Thoms's intimate areas. But the homicide occurred in the bathroom, and the medical examiner testified that the absence of injury to intimate areas would not rule out penetration by force. While there was no evidence as to the precise timing of the sexual activity and homicide, the rational inferences drawn from the evidence as a whole established that the underlying felony and homicide were one continuous transaction. That normally homebound Ben was left outside excluded any hypothesis of a romantic encounter ending badly. I tend to agree with Tscheu that a good deal of the State's case was built on speculation.[6] Nevertheless, after independent evaluation of the record, I would conclude the evidence was sufficient to support the conviction.

6. Neither the prosecutor nor defense counsel asked that the jury be given lesser-included offenses, both apparently in pursuit of a "go-for-broke," all-or-nothing verdict. The omission of warranted lesser-included offenses does not amount to error when the defendant expressly waives such instructions. *State v. Dahlin*, 695 N.W.2d 588, 598 (Minn.2005). But we have also emphasized that " '[n]either the prosecution nor the defense can limit the submission of such lesser degrees as the trial court determines should be submitted.' " *Id.* (quoting *State v. Leinweber*, 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975)). "While in theory a jury must acquit whenever the state has not proved all the elements of a charged offense, '[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction,' rather than let the defendant go free entirely." *State v. Harris*, 713 N.W.2d 844, 850 (Minn.2006) (quoting *Keeble v. United States*, 412 U.S. 205, 212–13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973)). When defendants opt for an all-or-nothing verdict, appellate courts rarely afford relief when, with the benefit of hindsight, the strategy may have been mistaken. *E.g., State v. Fulford*, 290 Minn. 236, 245, 187 N.W.2d 270, 276 (1971) (Peterson, J., concurring).