**STATE of Minnesota, Respondent,**

v.

**Elizabeth Mary HAWES, Appellant.**

**No. A10–1225.**

Supreme Court of Minnesota.

Aug. 24, 2011.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Anthony C. Palumbo, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, MN, for respondent.

Charles F. Webber, Faegre & Benson LLP, Minneapolis, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

Elizabeth Hawes was convicted of aiding and abetting the first-degree premeditated murder of her brother Edwin Hawes, in violation of Minn.Stat. § 609.05, subd. 1 (2010), and Minn.Stat. § 609.185(a)(1) (2010). The district court sentenced Hawes to life imprisonment. Hawes appeals, arguing that the evidence was insufficient to support her conviction. Hawes also argues that the district court erred when it ruled that out-of-court statements made by Hawes' younger brother, Andrew Hawes, were not admissible as declarations against penal interest and when it denied Hawes' motion for a new trial. We affirm Hawes' conviction.

This case arises from the October 2008 murder of Edwin Hawes. The last time anyone saw Edwin alive was on October 29, 2008, at approximately 6:30 p.m. Authorities eventually recovered his burned body from a fire pit in Cottonwood County, Minnesota, on October 31. The State's theory of the case was that Hawes helped Andrew commit the murder. Hawes claimed Andrew killed Edwin without her help.

Andrew and Edwin operated Hawes Lawn Service for about 20 years but in early 2007, the relationship between the brothers deteriorated, as did the relationship between Hawes and Edwin. The relationships between the siblings became strained because Hawes and Andrew believed that Edwin had stolen money from the lawn business and their grandmother, and they accused Edwin of theft.

Shortly after his brother and sister accused him of theft, Edwin went to his parents' house to have a conversation with his parents and Hawes. Prior to entering the house, Edwin called police dispatch to notify them that he was outside the house and that he was concerned about going inside because Hawes was inside and she always took Andrew's side. Once inside, Edwin told Hawes that he was fearful of Andrew because Andrew threatened to kill him and several people heard this threat. Hawes asked Edwin if he thought he deserved to be killed. Edwin responded that he just wanted to "get this all out on the

table" so that everyone could see that he did not steal any money.

Because of Andrew's death threat, Edwin changed his residence. He moved in with M.W., an elderly individual, in Andover, and did not communicate his new address to Andrew or Hawes. But on June 8, 2007, Hawes discovered Edwin's new address by following Edwin home from his daughter's dance recital in Spring Lake Park.[1] A police report documented Hawes' June 8 conduct. Edwin made the report when he became suspicious of the vehicle following him.

Also during June, Hawes and Andrew reported Edwin's alleged theft to several government agencies, including the Federal Bureau of Investigation, the Minnesota Attorney General, and the Robbinsdale Police Department. But Hawes and Andrew were frustrated by the response of the governmental agencies.

Approximately a year later, on July 19, 2008, Andrew rammed Edwin's car off the road in Minneapolis. Edwin's daughter, Avery, was a passenger in Edwin's car at the time. When Edwin's ex-fiancée, R.W., contacted Hawes a few days later, Hawes said that Andrew could not have hit Edwin's car because Andrew was in Ohio visiting his girlfriend on the day in question. Despite his alleged alibi, the State charged Andrew with two counts of second-degree assault, two counts of terroristic threats, and two counts of criminal damage to property because of the incident with Edwin.[2] A no-contact order was also issued prohibiting Andrew from having contact with Edwin and Avery.

On August 20, 2008, Special Agent Glenn Bona told Hawes that the theft allegations against Edwin were unfounded and, that even if they were true, the statute of limitations barred prosecution of Edwin. Bona testified that Hawes became "agitated" upon hearing this and asked Bona how the authorities could let Edwin get away with theft. Bona said that Hawes became "very volatile" and loud, and he described her demeanor as "on fire."

In September 2008, Hawes contacted R.W. about the visitation schedule Avery was to have with Edwin during that fall, and Hawes sought other details about Edwin's whereabouts. Hawes wanted to know Avery's visitation schedule, including the weekends R.W. and Edwin each had Avery, when R.W. and Edwin were to be on vacation, where and what time Avery was picked up, and what car Edwin would drive when he picked up Avery.[3] Hawes said that she needed to know this information because the authorities were investigating Edwin for theft and were very close to arresting him, and Hawes did not want Avery around when they arrested Edwin. This explanation was false because by September 2008, Hawes knew that the authorities had concluded that the theft allegations were unsubstantiated and that statute of limitations had expired.

On September 22, M.W., Edwin's housemate, caught Hawes looking around various areas of the property surrounding Edwin's residence, including the shed on the property. After M.W. confronted her, Hawes left. M.W. subsequently called the sheriff and made a report because he knew there were problems between Edwin and Hawes. Shortly thereafter, on September 24, Edwin obtained a restraining order

---

1. Hawes was accompanied by Andrew's girlfriend, Kristina Dorniden.

2. The record does not reflect the resolution of these charges.

3. The day of the murder, October 29, was not a day that Avery was with Edwin.

against Hawes. R.W. testified that Edwin obtained the restraining order because he believed Hawes was a danger to him.

On October 30, 2008, at approximately 2:30 a.m., Anoka County sheriff deputies Bryan Pierson and Brett Froslee were at the Woodland Creek Golf Course in Andover, about a half-mile from Edwin's residence. The deputies noticed a truck that was registered to Hawes Lawn Service parked in the parking lot. Shortly thereafter, the officers observed Hawes emerging from the woods. Hawes explained to Deputy Pierson that she was in the area visiting a friend to discuss a cancer benefit. Hawes told Pierson that her friend's name was "Sandy Thompson" and that she lived down the road. Pierson found Hawes' story suspicious, conducted a database search of "Sandy Thompson," and was not able to locate a person with that name living in the area. Pierson then conducted a database search of "Elizabeth Hawes" and learned that there were police reports regarding Hawes and Edwin. Pierson also learned that Edwin lived a half-mile away from the golf course. Given this information, Pierson once again asked Hawes why she was in the area. Hawes continued to maintain her story that she was visiting a friend. Pierson then decided to check on Edwin.

Pierson was about two blocks from Edwin's house when he came across a man, later identified as Andrew, staggering in the middle of the street and flagging him down. Andrew told Pierson that he was having a diabetic reaction. Pierson called an ambulance and while they were waiting for it to arrive, Andrew said his truck was located at a business nearby which turned out to be the golf course. Pierson drove Andrew to the golf course parking lot and subsequently asked Andrew why he was in the area. Andrew eventually told Pierson

that he had been in a fight with Hawes and that she ran off.

Pierson thought that Andrew and Hawes could have been at Edwin's residence and continued to question Andrew. Andrew eventually told Pierson that he and Hawes went over to Edwin's residence. Pierson then questioned Hawes, who told Pierson that they went to Edwin's house to repossess a Volkswagen Passat that belonged to Andrew after the business between Edwin and Andrew broke up. Pierson asked her how she was going to repossess the car and she pulled the key to a Volkswagen out of her sock.

Deputy Pierson finally checked on Edwin around 3:30 to 4:00 a.m. at Edwin's residence and learned from M.W. that neither Edwin nor the Passat were there. Pierson returned to the golf course and subsequently learned that there was a temporary restraining order on file prohibiting Hawes from having contact with Edwin. Pierson arrested Hawes for violating the restraining order, after she admitted to driving by Edwin's residence, and took her to jail. Andrew then drove away.

At approximately 2 p.m. that same day, M.W. called police to report that there was a "suspicious substance" in his driveway resembling blood. Upon arriving, M.W. and his adult daughter showed an officer pools and smears of what appeared to be blood around the property. M.W. told the officer that he was concerned because Edwin, along with his Passat, was missing. The officer secured the scene and additional law enforcement arrived to start collecting evidence.

Police learned that Andrew and his girlfriend, Kristina Dorniden, owned a farm in southern Minnesota located near Westbrook. Detective Larry Johnson of the Anoka County Sheriff's Office contacted Chief Alan Wahl, chief of police for the town of Westbrook, and informed Wahl

that there was an investigation going on into Edwin's disappearance.

Chief Wahl arrived at the Westbrook farm around 11:45 p.m. on October 30. Because Wahl knew that Anoka County authorities were suspicious of Andrew and Hawes, he left for a short time and returned with backup. When he returned, Wahl saw Hawes standing near a fire. Wahl then saw what appeared to be human bones and a cell phone case, which appeared to have blood on it, in the fire. Hawes said, "That's not a horse we're burning in there." Shortly thereafter, she said in the presence of a state trooper, "That's not my brother.... That's not my brother in there." Hawes said she made the comments because Cottonwood County Sheriff's Deputy Evers was asking questions about her brother. Shortly thereafter, the fire department put out the fire. Authorities carefully removed the remains of a human body, later determined to be Edwin's, from the fire pit and had it transferred to the Anoka County morgue.

Deputy Evers told Hawes that they were looking for Edwin. Hawes responded that Edwin embezzled a significant amount of money from the family. At some point during the conversation, Hawes also said, "Maybe [Edwin] was in an accident. [I] hope he dies. He's a very bad man." A short time later, the police arrested Hawes.

After Hawes was arrested, Dorniden returned to the farm in a Ford F–350 pickup truck. She told police that the truck belonged to Hawes, and that Hawes and Andrew rode in the truck from the Twin Cities to the farm. Dorniden said she and Hawes took turns driving.

In addition to witness testimony, the State presented physical evidence at trial. Dr. Janis Amatuzio, the Anoka County Medical Examiner, conducted the autopsy. Amatuzio testified that Edwin died of multiple blunt and sharp force injuries resulting from homicidal violence. She testified that one of these injuries was a sharp force wound caused by an arrow that entered through Edwin's chest and exited through his back.

Amatuzio also testified about the extensive amount of injuries to Edwin's head that were caused by three or four blows. Amatuzio testified that these blows likely occurred from a fall or a blunt object and caused fractures to the bones around the left eye, the left cheekbone, and the bones inside the deep part of the face. Amatuzio explained that some type of instrument caused these bones to crush inward and break into multiple small fragments. Finally, Amatuzio testified that Edwin had fractures to his pelvic region and these injuries were consistent with someone running Edwin over with a car.

In addition to the autopsy findings, the State presented physical evidence collected by investigators from various properties and vehicles related to the investigation. Investigators collected evidence from Edwin's residence. In addition to blood evidence, investigators found weapons around Edwin's property including two hammers and an aluminum bat. One of the hammers was located next to a woodpile near the shed, which was in a wooded area. The other hammer was located deep in the woods near the west side of the yard. These weapons did not have any blood on them. Because the weapons looked new and were free of rust, the State argued that someone placed these weapons around the property shortly before the murder. Investigators also found an aluminum bat in a woodpile near the shed that someone had painted black. There were also blood covered leaves and a pair of men's pants by the shed. Investigators also found a black spray paint can on the west side of the property, together with a jug believed

to contain liquid bleach, a broken and torn cell phone holster, a cellular phone battery, and a broken arrow.

When investigators searched Andrew's residence in Robbinsdale, they found newspaper in the garbage that looked like someone had spray painted items on it using black paint. They also found a black spray paint can in the garage.

There was also evidence of the murder in the location of the woods from where Hawes emerged when she approached the golf course parking lot in the early morning hours of October 30, 2008. In an area behind a utility box at the edge of the parking lot, investigators found a crossbow, a quiver containing a single arrow, and a separate arrow. Someone had painted the label on the interior side of the bow and the fins of the arrow black. Investigators also located a one-gallon plastic bleach jug with a blue screw top that was empty, a brown jacket, and a pair of white latex gloves with blood on them located about 10 to 15 feet away from the jacket. Fingerprint analysis revealed that there was a palm print found on the bleach jug that belonged to Andrew. DNA analysis also revealed that Andrew's DNA was on the exterior of the white latex gloves and Edwin's DNA was on the interior of the gloves.

The police also collected physical evidence at Hawes Lawn Service. Investigators found a black spray paint can on a desk similar to the paint found at Andrew's residence. Investigators also conducted Luminol testing on surfaces within the business to determine the presence of blood. The testing revealed various areas of blood around the business, including on the floor by the entrance door, walls, a light switch, and an office chair. Investigators also saw several holes in a cushion of a couch and when an investigator looked to the backside of the couch, there were "exit holes." Investigators also observed numerous holes in the sheetrock of the back wall that were in "relatively close proximity to each other." The projectile that went through these holes almost went through the metal siding on the outside of the building. Investigators believed that it was "very possible" that a crossbow would be powerful enough to make those holes.

Investigators also gathered physical evidence from several vehicles. Investigators processed the Hawes Lawn Service truck, a 2001 Chevrolet pickup, for evidence. They found a latex glove in the truck, but did not find any blood on the outside or inside of the pickup truck. Investigators also processed Andrew's Volkswagen Beetle, but did not find any blood on the outside or inside of the vehicle.

There was physical evidence on the pickup, a Ford F–350, suggesting that someone used this truck to transport Edwin's body. Investigators recovered an orange towel with blood on it from the passenger compartment of the truck. The blood on this towel matched Hawes' DNA profile. There was also a tennis shoe with an arrow sticking out of it. The arrow had blood on it that matched Edwin's DNA profile. Investigators also removed two bleach bottles and a pair of rubber gloves from the back of the truck. DNA testing on the inside of one of the gloves could not exclude Hawes' DNA profile, but it could exclude the DNA profile of Dorniden, Andrew and Daniel Romig, Hawes' husband. Further, DNA testing on the exterior of the glove could not exclude Edwin's DNA profile but did exclude all other suspects. Police also found Hawes' purse in the pickup. The purse contained the key to Edwin's Volkswagen Passat.

Investigators found Edwin's Volkswagen Passat in a church parking lot in Golden Valley, and collected physical evidence from the vehicle. When investigators lo-

cated the car, the car was locked and there were no keys inside the vehicle. There was biological matter found on the left front driving light and the front grill. There was also a large amount of blood present on the underside of the car. This blood smearing extended from the front of the vehicle to the tailpipe. There was blood on the front passenger headlight, driver's side front tire, rocker panel area on the driver's side, bottom portion of the driver's door, and left rear quarter of the vehicle. There was also a 14–inch blood smear on the rear bumper on the driver's side. There were some fabric impressions within the smeared blood on the driver's side rear fender. Investigators also found a three-pound sledgehammer with blood deposits in the trunk of the Passat. This hammer was similar to two hammers found at the murder scene. Blood matching Edwin's DNA profile was found on the steering wheel and gearshift handle of the Passat.

Finally, the State introduced telephone phone records showing numerous calls between Hawes and Andrew just before the murder. The calls then ceased during the time of the murder and resumed shortly thereafter. Cell tower information placed Andrew's cell phone near Edwin's residence during some of these calls.[4]

Hawes testified in her own defense. She said that she did not kill Edwin and she did not encourage her brother Andrew to kill him. She also testified that she did not know that Andrew planned to kill Edwin on October 29, 2008. Hawes testified that on October 29, she left work around 4:45 p.m. She then bought a ticket for the light rail and rode the train home. Hawes testified that she did a few errands around the house and then visited her mom in Golden Valley. She returned home around 8 p.m. Her husband, Daniel, and Andrew came to the house around 9 p.m. Later in the evening, Andrew made a request of Hawes. Hawes told Andrew in response that she was tired and did not want to help him. But Andrew persisted in his request and Hawes eventually drove with him in a Hawes Lawn Service truck to Andover. During this drive, Andrew gave Hawes the key to Edwin's Volkswagen Passat. They eventually arrived at a golf course and got out of the truck. They started walking down a residential street and Hawes asked Andrew why they were not at Edwin's house with the Passat. Andrew responded and Hawes testified that she screamed, "What?" Andrew then said something, and Hawes stated, "No, we are not." She then walked away from him and the police later arrested her at the golf course.

Hawes was released from jail in the afternoon of October 30 and she returned home to find Andrew there. She learned more about the events that occurred a day earlier and that Edwin's body was in her husband's pickup outside her house. She eventually drove the pickup down to Cottonwood County with Andrew and Dorniden to dispose of the body.

The State charged Hawes with aiding and abetting in the first-degree premeditated murder of Edwin. Hawes demanded a speedy trial. The jury found Hawes guilty of aiding and abetting first-degree premeditated murder. Hawes' counsel moved for a new trial on the ground of newly available evidence. Counsel contended that an affidavit from Andrew, stat-

---

4. On October 26, 2008, an unidentified person purchased two prepaid cellular telephones at a store located two blocks from Andrew's residence. The individuals who used these phones used them to communicate primarily with each other. But there were also phone calls placed and received on these phones from Hawes's home residence and Andrew's cell phone. The phones were not used after October 29.

ing that he would waive his Fifth Amendment right against self-incrimination and testify that Hawes had nothing to do with the murder of Edwin, was newly available evidence. The district court denied Hawes' motion for a new trial because Hawes and her counsel knew of this testimony at the time of trial. The court then sentenced her to life in prison without the possibility of parole. This direct appeal follows.

## I.

We turn first to Hawes' contention that there is insufficient evidence to support her conviction for aiding and abetting first-degree premeditated murder. A person is liable for a crime committed by another if the person "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1; *see also State v. Souvannarath,* 545 N.W.2d 30, 33 (Minn.1996). To be guilty of aiding and abetting a crime, the defendant does not need to have participated actively in the actual commission of the crime. *Bernhardt v. State,* 684 N.W.2d 465, 477 (Minn.2004). But the State must prove that the defendant had "knowledge of the crime and intended his presence or actions to further the commission of that crime." *State v. Clark,* 755 N.W.2d 241, 257 (Minn.2008) (citation omitted) (internal quotation marks omitted). Jurors can "infer the necessary intent from factors including: defendants presence at the scene of the crime, defendants close association with the principal before and after the crime, defendants lack of objection or surprise under the circumstances, and defendants flight from the scene of the crime with the principal." *State v. Swanson,* 707 N.W.2d 645, 659 (Minn.2006) (citation omitted) (internal quotation marks omitted).

Hawes argues that the evidence is not sufficient to sustain her conviction because the States case was wholly circumstantial and that the reasonable inferences to be drawn from the circumstantial evidence support only a conviction for accessory after the fact. She also argues that the evidence was insufficient under the standard we applied in *State v. Ulvinen,* 313 N.W.2d 425 (Minn.1981). We consider these arguments in turn.

## A.

Hawes' first sufficiency of the evidence argument is premised on the fact that the State presented only circumstantial evidence against her. In circumstantial evidence cases, "the circumstances proved must be consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Andersen,* 784 N.W.2d 320, 330 (Minn.2010). Hawes argues that the evidence was not sufficient to support her conviction because the defense presented evidence that supports a rational hypothesis that Hawes did not aid and abet the killing of Edwin. In order to review whether the evidence was sufficient in this circumstantial evidence case, we follow a two-step process. *Id.* at 329.

The first step in this analysis is to identify the circumstances proved. *Id.* In identifying the circumstances proved, we "defer, consistent with our standard of review, to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* (citation omitted) (internal quotation marks omitted). Stated another way, we "construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the States witnesses and disbelieved the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn.2008). Under this standard, we

disregard testimony that is inconsistent with the verdict. *See id.*

The second step in this analysis is to determine whether the circumstances proved are "consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt." *Andersen,* 784 N.W.2d at 329. Unlike the deference we give to the jury in reviewing circumstances proved, we give "no deference to the fact finders choice between reasonable inferences." *Id.* at 329–30. When evaluating whether the circumstances proved are consistent with a rational hypothesis of guilt and inconsistent with a rational hypothesis of innocence, we "do not review each circumstance proved in isolation." *Id.* at 332. Instead, we consider whether the circumstances proved are "consistent with guilt and inconsistent, *on the whole,* with any reasonable hypothesis of innocence." *Id.* (citing *State v. Curtis,* 295 N.W.2d 253, 258 (Minn.1980) (alteration in original)).

## 1.

The State proved the following circumstances at trial. Hawes had disdain for her brother because she believed that he embezzled money from a family business and misappropriated money from her grandmother. Hawes believed that Edwin had taken advantage of everyone in her family including herself. Hawes was also frustrated because, despite her efforts to seek help from the FBI, the Minnesota Attorney General, the Robbinsdale Police Department, and the Minnesota Financial Crimes Task Force, the authorities were not going to arrest Edwin for his alleged financial crimes. When Special Agent Bona told Hawes that Edwin would not be arrested because he did not commit any crimes and even if he did, the statute of limitations would prevent prosecution, Hawes became very loud, hostile and "on fire" because she believed that Edwin was getting away with theft. Hawes also asked Bona during this conversation why Bona was allowing Edwin to get away with his alleged crimes.

Edwin did not tell Andrew or Hawes where he lived. Before the murder, Hawes discovered where Edwin lived by following him home from his daughter's dance recital while driving Andrew's Volkswagen Beetle. Hawes also gathered information about when Edwin's minor daughter would be absent from Edwin's home.

On September 22, 2008, sometime in the mid-afternoon, M.W. caught Hawes looking around the residence he shared with Edwin. Hawes went beyond the yard area, walked into the shed, and climbed the steps to a deck once she knew that Edwin's car was not there. Edwin obtained a restraining order against Hawes because he believed that he was in danger of Hawes.

Hawes knew that Andrew had threatened to kill Edwin and had previously assaulted him. Specifically, Edwin explained during a conversation with Hawes and his parents that Andrew threatened to kill him and several people heard the threat. Hawes responded by asking Edwin if he really believed that Andrew would kill him and if Edwin believed that he deserved to be killed. Further, in July 2008, Andrew rammed Edwin's car off the road. The State eventually charged Andrew with two counts of second-degree assault, two counts of terroristic threats, and two counts of criminal damage to property.

In the few hours immediately before and after Edwin's murder, there were telephone calls placed between phone numbers associated with Hawes, Andrew, and pre-

paid cell phones. Some of these calls were placed near Edwin's residence.

Hawes was near the murder scene within hours of the crime, and the police arrested Hawes near Edwin's house. Hawes repeatedly lied to police about why she was at the golf course when Deputy Pierson questioned her in the early hours of the morning. Hawes came out of the woods near the area where evidence relating to the murder was found. Specifically, in this area investigators found a crossbow, a quiver, two arrows, an empty one-gallon plastic jug with a blue screw cap, a brown jacket, and a pair of white latex gloves with blood on them containing a mixture of Andrew and Edwin's DNA.

Hawes also participated in burning Edwin's body. Hawes and Dorniden took turns driving a truck belonging to Hawes' husband to the Cottonwood County farm owned by Andrew and Dorniden, knowing that Edwin's body was in the bed of the truck. Police also found Hawes standing over Edwin's burning body in the fire pit. Hawes spontaneously told police when they approached her as she was standing over Edwin's body, "That's not a horse we're burning in there." Then she said, "That's not my brother [Edwin]. That's not my brother in there." At some point during the conversation with an officer, she responded to the officer's question about her knowledge of Edwin's whereabouts. Hawes stated, "Maybe [Edwin] was in an accident. [I] hope he dies. He's a very bad man." Investigators later searched the Ford F–350 used to transport Edwin's body from the Twin Cities to Cottonwood County. There was physical evidence in this pickup with Hawes' DNA profile on it, including an orange towel and a rubber glove.

Hawes was in possession of the key to Edwin's Passat. The vehicle was locked and there were no keys inside when investigators located the vehicle. Hawes showed the key to Detective Pierson in the early morning hours of October 30, 2008, and it was found later in her purse, which investigators located during their search of the Ford F–350 truck. Investigators found biological matter on the left front driving light and the front grill of the Passat. There was also a large amount of blood present on the underside of the car, extending from the front of the vehicle to the tailpipe. There was also blood on various other locations on the inside and outside of the car, including some fabric impressions with blood smeared on the driver's side fender. Investigators found blood matching Edwin's DNA profile on the steering wheel and gearshift handle. Dr. Amatuzio testified that Edwin had fractures to his pelvic region and these injuries were consistent with someone running Edwin over with a car.

 In arguing that the evidence is insufficient, Hawes cites her own testimony, during which she denied involvement in Edwin's murder. But, in determining the circumstances proved, we consider only those circumstances that are consistent with the verdict. *Andersen*, 784 N.W.2d at 330 (determining what circumstances were proved considering the evidence "in a light most favorable to the State"); *Tscheu*, 758 N.W.2d at 858. This is so because even in cases based on circumstantial evidence, the jury is in the best position to evaluate the credibility of the evidence. Consistent with our standard of review, we defer "to the jury's acceptance of the evidence that supports the verdict and rejection of evidence in the record that conflicted with circumstances proved by the State's evidence." *Andersen*, 784 N.W.2d at 329 (quoting *State v. Stein*, 776 N.W.2d 709, 716 (Minn.2010)) (internal quotation marks omitted). Hawes' testi-

mony conflicts with the State's evidence that supports the verdict and so under the proper standard of review, we do not consider Hawes' testimony when identifying the circumstances proved. *See id.*

### 2.

 Having determined the circumstances proved, we now consider whether those circumstances, when assessed in their entirety, support a reasonable hypothesis that Hawes aided and abetted her brother Andrew in the murder of their brother, Edwin. From the circumstances proved, the jury could reasonably infer that Hawes had a motive to kill Edwin because she believed Edwin stole money from Hawes Lawn Service, where she was vice-president, and from their grandmother. Hawes became enraged when she learned that the government authorities were not going to pursue prosecution of Edwin and she told an officer at the bonfire in Cottonwood County that she hoped her brother was dead.

The jury could also reasonably infer that Edwin was fearful of his sister. Edwin secured a restraining order against Hawes a month before his murder because he believed he was in danger of Hawes. He was also afraid of her because he believed that she always took Andrew's side, and Andrew had threatened to kill Edwin.

The jury could also reasonably infer that Hawes gathered information about Edwin's schedule from R.W., and information about the property where he lived, and that this information aided the alleged killer, Andrew. With respect to the information about Edwin's schedule, it is also reasonable to believe that Hawes had a criminal purpose for the visitation information she received from R.W. in September 2008. Hawes misrepresented her purpose for obtaining the information, contending that she needed the visitation information because the authorities were going to arrest Edwin very soon and she did not want Avery around when they arrested Edwin. But this reason for obtaining the visitation information disappeared in August 2008, when Hawes learned that Edwin would never be arrested. Nevertheless, Hawes persisted with inquiring about Edwin's visitation schedule for the fall when she called R.W. in September 2008.

It is also reasonable to believe that Hawes was gathering information about Edwin's residence when she was snooping around the residence on September 22, 2008, and that she provided this information to Andrew. Information about the layout of this property was necessary for this murder because someone placed weapons around the property including hammers and an aluminum bat in case they were needed. One of the hammers found was located next to a woodpile near the shed that Hawes went into when she walked around the property, five weeks before the murder. In addition, testimony established that investigators found blood covered leaves and a pair of men's pants near the same shed, supporting the inference that Edwin's body was hidden under a pile of leaves near the shed prior to being moved to Cottonwood County. There is no evidence in the record to indicate that anyone other than Hawes was gathering information as to the property where Edwin lived. There is also no evidence in the record to indicate that Andrew was ever at Edwin's residence before the murder.

It is reasonable to believe that Hawes was involved with Edwin's murder because Hawes had the key to the Volkswagen Passat in her possession shortly after the murder. The evidence from both the Passat and the autopsy on Edwin's body sup-

port the inference that someone ran Edwin over with his Passat.

Further, it is reasonable to believe that Andrew and Hawes were contacting each other in the hours leading up to the murder to talk about the plan to murder Edwin. On October 29, there were numerous short, successive calls between phones associated with Hawes and Andrew in the hours leading up to the murder. The calls then ceased during the approximate time of the murder and resumed shortly thereafter. Cell tower information placed Andrew's cell phone near Edwin's residence during some of the phone calls to Hawes' place of employment and her residential line. Additionally, someone purchased two prepaid cell phones, and these prepaid cell phones called both Andrew's cell phone and Hawes' residential line shortly after the murder. The prepaid phones also called each other. The use of the prepaid phones supports the inference that those who used them wanted to talk without a record of their communication.

Finally, Hawes assisted with cleaning up the murder, both in Andover and Cottonwood County. It is reasonable to believe that, given the circumstances, Hawes was cleaning up in an effort to protect herself. The police arrested Hawes in the early morning hours of October 30 for violating a restraining order because she admitted to being near Edwin's residence. Once she was released from jail later in the day, she went right back to cleaning up the murder. Hawes and Dorniden took turns driving the Ford F–350 with Edwin's body in the back to Cottonwood County and Hawes stood near the bonfire as Edwin's body burned.

In sum, it is reasonable to infer from the circumstances proved that Hawes aided and abetted Edwin's murder. She had a motive and she gathered information about Edwin's address, schedule and property that was helpful to Andrew. The phone conversations between Andrew and Hawes immediately before the murder also support a reasonable inference that Hawes was assisting Andrew in the crime. Finally, Hawes helped Andrew hide the body and other evidence of the murder. The evidence is therefore sufficient to support the conviction. *See State v. Russell,* 503 N.W.2d 110, 114 (Minn.1993) ("The state meets its burden" to prove aiding and abetting "by showing 'some knowing role in the commission of the crime by a defendant ....' " (quoting *State v. Merrill,* 428 N.W.2d 361, 367 (Minn.1988))).

Not only is it reasonable to conclude from the circumstances proved that Hawes aided Andrew in commission of the murder, but that is the only reasonable hypothesis supported by the circumstances proved when the circumstances are considered in their entirety. Hawes' argument to the contrary rests entirely on her own testimony, which as we noted above, is not part of the circumstances proved. Moreover, in order to conclude that the only crime Hawes committed was accessory after the fact, the evidence regarding Hawes' motive and the planning activity would have to be ignored. But we examine the circumstances proved in their entirety, not certain facts in isolation. *Andersen,* 784 N.W.2d at 332 ("But we do not review each circumstances proved in isolation."). When the circumstances proved are taken together, there cannot be a reasonable hypothesis that Hawes is not guilty of aiding and abetting Edwin's murder. We therefore hold that the circumstantial evidence was sufficient to support Hawes' conviction of aiding and abetting first-degree premeditated murder.

### B.

In addition to the sufficiency of the evidence argument she makes based on the

inferences to be drawn from the circumstantial evidence, Hawes also argues that the evidence was not sufficient based on the aiding and abetting standard we applied in *State v. Ulvinen,* 313 N.W.2d 425 (Minn.1981). Specifically, Hawes contends that this case is almost identical to *Ulvinen* because the "jurors were confronted with a gruesome murder" and the juries in both cases found the defendants conduct "so shocking that it deserved punishment." Hawes also argues that like the facts in *Ulvinen,* there is no evidence in this case that Hawes encouraged Andrew to take a course of action that he might not otherwise have taken. Therefore, she argues, the evidence is not sufficient to support her conviction for aiding and abetting Andrew in Edwins murder. We disagree.

In *Ulvinen,* Ulvinen's son told her of his intent to kill his wife, and she responded, "it will be for the best." *Id.* at 427. The evidence also indicated that Ulvinen was asleep when her son killed his wife, but she made sure that the children did not enter the bathroom after the murder when her son dismembered the body. Ulvinen also helped her son clean up the murder, and assisted him in corroborating his story that his wife left him in an effort to cover up the murder. *Id.* at 426. We reversed Ulvinens conviction for aiding and abetting her son in the murder. We found that there was no evidence that the remark made by Ulvinen, "it will be for the best" if her son killed his wife, had any influence on her sons decision to kill his wife. *Id.* at 428. Because the aiding and abetting statute requires "something more of a person than mere inaction to impose liability as a principal," and Ulvinens comment constituted only "passive approval," we held that the evidence was insufficient to convict Ulvinen of aiding and abetting the murder of her sons wife. *Id.* at 428–29.

The evidence of Hawes involvement in the murder is much different from that presented in *Ulvinen.* Unlike the appellant in *Ulvinen,* Hawes did not simply passively acquiesce in Edwin's murder. Hawes gathered information about Edwins residence, the property surrounding the residence, and Edwins visitation schedule with his daughter. The jury could reasonably infer that Hawes provided this information to Andrew, the person who murdered Edwin, and that the information provided was useful in the commission of the murder. Hawes also had a motive for the murder and she participated in the cleanup of the murder.

Hawes contends, however, that *Ulvinen* requires that the State prove that Hawes encouraged Andrew to take a course of action that he would not otherwise have taken in order for Hawes to be guilty of aiding and abetting. Hawes argues that the State did not meet this burden because Andrew was "otherwise inclined to murder Edwin," and that the State did not prove that Hawes "put him up to it." Under the statute, if a person "procures" another to commit a crime, the person is guilty of aiding and abetting. *See* Minn.Stat. § 609.05, subd. 1. But a person is also guilty of aiding and abetting if the person intentionally aids, advises or counsels the other to commit the crime. *Id.; see also Clark,* 755 N.W.2d at 257 (noting that the State must prove that "the defendant had knowledge of the crime and 'intended his presence or actions to further the commission of that crime.' " (citation omitted)). As set forth above, the evidence reflects that Hawes knowingly aided Andrew in killing Edwin, and her actions furthered the commission of this crime. We therefore hold that the evidence is legally sufficient to support Hawes conviction.

## II.

We turn next to Hawes' contention that the district court erred when

it prevented Hawes from testifying to out-of-court statements made by Andrew.[5] Specifically, Hawes asserts that the court erred when it excluded statements allegedly made by Andrew to Hawes regarding the circumstances of the murder.[6] Hawes first asserts that the statements were admissible hearsay because they are statements against Andrew's penal interest and she provided corroborating circumstances to indicate the statements' trustworthiness. *See* Minn. R. Evid. 804(b)(3) (stating that statements made by an unavailable witness are admissible if the statements would subject the declarant to criminal liability so long as "corroborating circumstances clearly indicate the trustworthiness of the statement"). Hawes alternatively asserts that these statements were admissible non-hearsay statements because she did not offer them to prove the truth of the matter asserted, but offered them to show the effect Andrew's statements had on Hawes and to explain her actions.

We need not, and do not, decide whether the district court erred when it prevented Hawes from using out-of-court statements made by Andrew because any alleged error was harmless beyond a reasonable doubt.[7] This is so because much of what Hawes claims the district court erroneously excluded was already presented to the jury. The statements in the written offer of proof provide additional details of the murder, but the substantive point of these statements is that Andrew committed the murder. That Andrew murdered Edwin

5. The State made a motion on March 24, 2011, to strike references to Andrew's testimony at his own trial from Hawes' brief. In an order filed on April 7, 2011, we deferred consideration of the motion until consideration of Hawes' appeal on the merits. Because the references to Andrew's testimony in Hawes' brief are outside of the record in this case, we grant the State's motion.

6. In her written offer of proof, Hawes indicated that she would testify that Andrew made the following statements to her between October 29 and October 31, 2008:(1) Andrew confessed to Hawes the planning and murder of Edwin; (2) Andrew told Hawes that he picked Kristina Dorniden up at her parents' house around 5:30 p.m. driving a grey Volkswagen Beetle and that Dorniden was to drop him off hear Edwin's residence in Andover; (3) Andrew told Hawes that he waited in the woods near Edwin's property for Edwin to arrive and there were weapons that he had previously placed around the property; (4) Andrew stated that Edwin arrived home, Andrew confronted him, and Andrew eventually shot Edwin with a crossbow that he pulled out from under a pile of leaves; (5) after shooting Edwin, Andrew continued to struggle with him, hitting him with a hammer and eventually driving over him with the Passat and covering his body with a pile of leaves; (6) Andrew drove the Passat to the Hawes Lawn Service building in north Minneapolis and called Hawes' husband, Daniel Romig; (7) Romig helped Andrew clean up; (8) Andrew drove the Passat to a church parking lot in Golden Valley; (9) Andrew and Romig drove to a Rainbow Foods in south Minneapolis in an attempt to create an alibi by being shown on surveillance camera footage; (10) Andrew tricked Hawes into going to Edwin's residence in the early morning hours of October 30; and (11) Romig helped "Andrew dispose of the body and clean up the murder scene. In addition to testifying about the statements contained in the offer of proof, Hawes contends that she should have been allowed to explain that Andrew convinced her to go to Edwins house during the early morning hours of October 30, 2008, under the guise of repossessing the Passat," and that while she and Andrew walked toward Edwins house, Andrew told Hawes that Edwin was dead and he needed her help moving the body.

7. We apply the beyond-a-reasonable-doubt-harmless-error standard because we understand Hawes' claim to be that the district court's erroneous exclusion of evidence violated Hawes' constitutional right to present a complete defense. *See State v. Hall*, 764 N.W.2d 837, 842, 844 n. 4 (Minn.2009) (applying the beyond-a-reasonable-doubt-harmless-error standard to assess constitutional errors).

was not in dispute at Hawes trial; the question was whether Hawes aided and abetted Andrew in committing the murder. To the extent the statements at issue bear on this question, Hawes, in effect, presented this evidence to the jury. In her direct examination, Hawes testified that Andrew made a request of her that caused her to leave her home and go with Andrew to Andover. She also testified that Andrew handed her the key to Edwins Volkswagen Passat and that Andrew told her the real reason why they had gone to Edwins house. She testified that she was screaming when she found out, she started walking away and telling Andrew, "No we are not. I'm getting the truck and we are going home." Hawes was also able to testify as to her reactions to what Andrew told her, how she was stunned and that she did not know what to do as a result of what Andrew said to her. In short, because the evidence at issue was largely in front of the jury, we hold that any error was harmless beyond a reasonable doubt.

### III.

▇ We turn next to Hawes' contention that the district court erred when it denied her motion for a new trial on the grounds of newly available evidence.

Hawes based her motion on an affidavit from Andrew stating that he would waive his Fifth Amendment right against self-incrimination and testify that Hawes was not involved with Edwin's murder. Because Hawes and her counsel knew of Andrew's expected testimony at the time of trial, we conclude the court did not err when it denied Hawes' motion for a new trial.

▇ A district court may grant a new trial "on the issue of guilt ... [for n]ewly discovered material evidence, which with reasonable diligence could not have been found and produced at the trial." Minn. R.Crim. P. 26.04, subd. 1(1). To obtain a new trial on the ground of newly discovered evidence, a defendant must establish: "(1) that the evidence was not known to him or to his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to the lack of diligence, (3) that the evidence is material ..., and (4) that the evidence will probably produce either an acquittal at a retrial or results more favorable to the petitioner." *State v. Warren,* 592 N.W.2d 440, 450 (Minn.1999).[8] We have previously held that this test applies to newly available evidence as well. *Id.; see also Whittaker v. State,* 753 N.W.2d 668, 671 (Minn.2008).[9]

---

8. This test is formulated in the context of a petition for post-conviction relief under Minn. Stat. § 590.01 (2010). Even though Hawes did not bring her motion under section 590.01, the parties do not contend that the district court erred in relying on this articulation of the standard for awarding a new trial.

9. Hawes asks to modify the test defendants must satisfy to obtain a new trial based on newly available evidence. Under Hawes' proposed test, the defendant must prove that: (1) the evidence was not *available* to him or to his counsel at the time of trial; (2) *the unavailability of the evidence* before trial was not due to a lack of diligence; (3) the evidence is material; and (4) the evidence will probably produce either an acquittal at a retrial or

results more favorable to the petitioner. Hawes asserts that this proposed test properly focuses the district court's inquiry on the availability of evidence instead of the knowledge of the evidence. Hawes asserts that she satisfies all of the elements of the modified test. We reject Hawes' invitation to modify our newly available evidence test. Our precedent is clear that our newly available evidence test is the same as our newly discovered evidence test and Hawes has not articulated a compelling reason for us to deviate from our precedent. *See Warren,* 592 N.W.2d at 450 (holding that the newly discovered evidence test and the newly available evidence are the same); *Whittaker,* 753 N.W.2d at 671 (same); *see also State v. Martin,* 773 N.W.2d 89, 98 (Minn.2009) (explaining that we are "ex-

We review the denial of a motion for a new trial for an abuse of discretion. *State v. Green*, 747 N.W.2d 912, 917 (Minn.2008).

Our review of the record leads us to conclude that Hawes and her counsel had knowledge of Andrew's expected testimony at the time of trial and the evidence was therefore available to Hawes. The information contained in the affidavit was similar to the statements made by Hawes' attorney during opening argument. Andrew's affidavit contains information similar to that provided in the written offer of proof Hawes submitted and in Hawes' testimony at trial. The affidavit consequently did not provide any new information. *See Scherf v. State*, 788 N.W.2d 504, 508 (Minn. 2010) ("explaining that 'the statement of an individual who refused to testify at trial is

not "unknown" ... if, at the time of trial, the petitioner knew the substance of the testimony that the individual might provide.'" (quoting *Whittaker*, 753 N.W.2d at 671)). We therefore hold that the district court did not abuse its discretion when it denied Hawes' motion for a new trial on the grounds of newly available evidence.[10]

Affirmed.

STRAS, J., took no part in the consideration or decision of this case.

---

tremely reluctant to overrule our precedent under principles of *stare decisis* " and that we require a "compelling reason before a prior decision will be overruled" (citations omitted) (internal quotation marks omitted)).

**10.** Hawes contends that she is entitled to a new trial in the interests of justice because the district court erroneously prevented Hawes from testifying to out-of-court statements made by Andrew due to his exercise of his Fifth Amendment right against self-incrimination. Hawes contends that because the court precluded any of these statements from being

introduced at trial, she was prevented from presenting an adequate defense that could explain her actions. Hawes situation is not an "extraordinary situation" that warrants the grant of a new trial in the interests of justice. *Gassler v. State*, 787 N.W.2d 575, 586 (Minn.2010). As noted above, the court did not deny Hawes the ability to present an adequate defense because much of what Hawes claims was erroneously excluded was already presented to the jury. For these reasons, we hold that a reversal in the interests of justice is not warranted.