*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0011**

State of Minnesota,
Respondent,

vs.

Marlon James Sands,
Appellant.

**Filed January 23, 2017
Affirmed
Ross, Judge**

Redwood County District Court
File No. 64-CR-14-535

Lori Swanson, Minnesota Attorney General, St. Paul, Minnesota; and

Steven S. Collins, Redwood County Attorney, Jenna M. Haler, Assistant Redwood County Attorney, Redwood Falls, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Anders J. Erickson, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Schellhas, Judge; and Jesson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

Appellant Marlon Sands took D.L.S.'s car, crashed it in a ditch, and abandoned it.

On appeal, Sands argues that his conviction for motor-vehicle theft must be reversed

because the circumstantial evidence against him did not establish that he knew or had reason to know that he lacked D.L.S.'s consent to take the car. We affirm because the proved circumstances are consistent with Sands's conviction and inconsistent with any rational hypothesis of innocence.

## FACTS

D.L.S. called the Cottonwood County Sheriff's Office on April 16, 2014, and reported her 1999 Pontiac Grand Prix stolen from her home in Jeffers. The next morning, Redwood County Deputy Sheriff Andrew Larsen found the car off the north side of County Road 24. It had left the road near the Jackpot Junction Casino Hotel and passed into the thick brush. The car's ignition had been opened and disassembled. The two counties communicated about the car, and Cottonwood County investigated.

Cottonwood County investigator Jeff Lacanne met with D.L.S., who produced a text-message exchange she had with her boyfriend, Jared Hansen, on April 16. Investigator Lacanne learned that Hansen and Sands had taken the car and driven it from Jeffers to Redwood Falls. In the text messages, D.L.S. repeatedly questioned Hansen about her car. Hansen responded on April 17, "Smoke ["Smoke" is Sands's nickname] put the car in the ditch. I was with him at a friends and he told me he had to get something so i gave him the keys. off he went....." D.L.S. also showed the investigator messages exchanged between her and Sands on April 16. D.L.S. demanded Sands return her car so she could drive to work. Sands told D.L.S. to take another car to work, saying, "[W]e are gonna be late I'm sorry [it's] my fault[.]" Sands also told D.L.S. that they could "be there in 30 mins," that they could "swap cars," and that they were "15 mins away."

2

While Investigator Lacanne interviewed D.L.S., D.L.S. received a phone call from Hansen, which the investigator recorded. Hansen said, "Smoke was driving when [the car went] in the ditch[.] I wasn't even with him[.] I didn't hear from him until last night[.] [T]hat's why I didn't talk to you yesterday [because] I didn't know what was going on or where the car was[.] I didn't know what was going on so I didn't know what to say to you[.] [S]o yeah . . . ."

Investigator Lacanne interviewed Hansen ten days later. Hansen said that he and Sands went to D.L.S.'s house, that D.L.S. gave Hansen the car and money to go to Redwood Falls, and that Sands asked for the car keys to get some items out of the car. And he concluded, "[Sands] took the car without my consent after it was borrowed to me by [D.L.S.] . . . ."

The investigator spoke again with D.L.S., who acknowledged that she might have lent the car to Hansen. She showed Lacanne more messages between her and Sands from April 21. D.L.S. asked Sands if he totaled her car, and Sands responded, "I was drivin yea but i was goin 40 when i hit a ice slick and we almost hit a semi slidin sideways[.]"

The state charged Sands with felony motor-vehicle theft in August 2014, and the district court conducted a jury trial in September 2015.

Investigator Lacanne and Deputy Hansen detailed their investigation. Investigator Lacanne emphasized that D.L.S. had asked Hansen and Sands repeatedly to return the car. Deputy Larsen testified about the ignition, stating that "vehicles that have [the] ignition torn apart like this . . . normally it shows that [the vehicle] is probably [a] stolen vehicle."

Hansen testified that he was in Redwood Falls on April 16, 2014. He estimated that during the time he dated D.L.S. (they were no longer a couple at the time of the trial), she had let him use her car approximately 100 times. She never let him give it to anyone else. He said that Sands knew that D.L.S. owned the car. Hansen testified in support of Sands that D.L.S. allowed Sands to drive the car numerous times, including on April 16. He said that he gave Sands the keys that day. He attempted to explain his previous inconsistent statements that Sands took the car without his permission, saying that he had lied to police to prevent D.L.S. from becoming angry with him. He said, "I don't care if [D.L.S. is] mad at me or not. [A]t the time . . . I didn't want her upset with me, and so [Sands] told her that he was responsible." On cross-examination, Hansen claimed that he gave Sands permission to take the car, again explaining that he thought D.L.S. would be upset with him because he had "allowed someone else to use the car."

D.L.S. also testified. She said that her vehicle had been at her residence on April 15, 2014, but when she woke up the next morning it was gone. She testified that she had not given Hansen permission to take it but that she could not remember if he had asked. She sent Hansen text messages before contacting police, she said, because she had frequently let him use her car. D.L.S. claimed that Hansen always asked to use the car first, and she had never let him lend the car to any other person. After she saw the text message from Hansen indicating that he had her car, she said she waited to report the car stolen because "[Hansen and Sands] kept saying, 'yep, we're going to bring it back.'" D.L.S. said she never gave Sands permission to use her car and that she told Hansen that he was only one allowed to drive it.

The jury found Sands guilty of motor-vehicle theft. Sands moved for a new trial and the district court denied the motion. The district court sentenced Sands to 60 months in prison. Sands appeals.

**D E C I S I O N**

Sands argues that his conviction must be reversed because the circumstantial evidence was insufficient to prove that he either knew, or had reason to know, that he did not have consent to drive the car. When reviewing a claim of insufficient evidence, we generally read the record to determine whether the evidence, considered in the light favorable to the conviction, supports the jury's finding of guilt beyond a reasonable doubt. *State v. Caine*, 746 N.W.2d 339, 356 (Minn. 2008). We assume that the fact-finder disbelieved any evidence that conflicted with the verdict. *State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015). But we scrutinize more strictly a conviction based on circumstantial evidence. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). We ask whether the proved circumstances and reasonable inferences drawn from those circumstances are consistent with guilt and inconsistent with any rational, non-guilty hypothesis. *Id.*

We must decide whether the circumstantial evidence proved that Sands committed motor-vehicle theft, which occurs when a person "takes or drives a motor vehicle without the consent of the owner or an authorized agent of the owner, knowing or having reason to know that the owner or an authorized agent of the owner did not give consent[.]" Minn. Stat. § 609.52, subd. 2(a)(17) (2012). Sands does not contend that the evidence fails to prove that he drove D.L.S.'s car. He maintains instead that the circumstantial evidence was insufficient to prove that he knew, or should have known, that he did not have consent to

5

drive the car. We therefore must decide whether the proved circumstances are consistent only with a finding that Sands knew (or should have known) that he lacked consent.

Our analysis has two steps. *See Al-Naseer*, 788 N.W.2d at 473–74. We first identify the circumstances proved, recognizing that the jury accepted the proof of those circumstances and rejected any conflicting evidence. *Id.* at 473. In other words, we accept as proved only those circumstances that are consistent with the verdict. *See State v. Hawes*, 801 N.W.2d 659, 668–69 (Minn. 2011). We next independently examine the reasonableness of inferences that might be drawn from the proved circumstances, including inferences consistent with rational hypotheses other than guilt. *Al-Naseer*, 788 N.W.2d at 473–74. We consider the circumstantial evidence not in isolated bits but as a whole. *State v. Hurd*, 819 N.W.2d 591, 599 (Minn. 2012).

Looking to the evidence in light of the guilty verdict, we conclude that the state proved the following circumstances:

- Hansen took the car from D.L.S.'s home on April 15, 2014, and Sands was with him.

- Hansen may have asked D.L.S. to use the car, but she did not consent to him using it.

- D.L.S. never allowed Hansen to lend the car to another person.

- D.L.S. did not tell Sands he had permission to drive her car.

- Hansen gave Sands the car keys.

- Sands acknowledged to D.L.S., "I'm sorry [it's] my fault[.]" And he promised he and Hansen would return the car soon and asked that she use a different car.

6

- Sands did not follow D.L.S.'s demands, "Just . . . get my car here NOW and trust me this will never happen EVER again" and "I said for u guys to get my car back[.]"

- Sands drove the car off the road in Redwood Falls, admitting, "I was drivin yea but i was goin 40 when i hit a ice slick and we almost hit a semi slidin sideways[.]"

- D.L.S. reported the car stolen on April 16, 2014.

We recognize that a reasonable jury might have believed Hansen (and not believed D.L.S.) about Hansen having D.L.S.'s express permission to use the car on April 15. But the verdict informs us that the jury weighed the credibility of the contradictory, sometimes inconsistent testimony, and it believed D.L.S. and not Hansen. We are in no position on appeal to substitute our own assessment for the jury's considered credibility judgment. *See State v. Bliss*, 457 N.W.2d 385, 391 (Minn. 1990) (stating that appellate courts do not "retry the facts" because resolving conflicting testimony is the jury's function).

The state points to Sands's text messages admitting fault and promising to promptly return D.L.S.'s car even while he knew he had already totaled the car and abandoned it in a ditch. It is true that abandoning the car and then lying about it reflects a consciousness of guilt. *See State v. McDaniel*, 777 N.W.2d 739, 747 (Minn. 2010); *Eggersgluss v. Comm'r of Pub. Safety*, 393 N.W.2d 183, 185 (Minn. 1986). But the guilt implied by Sands's misleading text messages might have been guilt about wrecking D.L.S.'s car, not about driving it without consent. Either motive is reasonable, so Sands's text messages by themselves do not establish the disputed *mens rea* element.

Sands offers alternative arguments on the factually disputed matter of Hansen's giving him the car keys. He argues that either the jury accepted Hansen's testimony that he gave Sands the keys, or the jury rejected Hansen's testimony and the state presented no

other evidence on the element of Sands's *mens rea*. Either way, he urges, the knowing-lack-of-consent element is not proved. The argument supposes, mistakenly, that if Hansen consented to Sands's using the car, then Sands had the consent of an "authorized agent." But if the jury accepted Hansen's testimony that he gave Sands the keys, then D.L.S.'s testimony that Hansen lacked permission to have the car precludes any rational hypothesis of innocence. And again, based on the verdict we accept as proved by D.L.S.'s testimony the circumstance that D.L.S. had never authorized Hansen to allow anyone to use the car. We add that Hansen's explanation to the jury tends to confirm D.L.S.'s account. That is, by telling the jury that he had lied to police in telling them that Sands took the car without his permission because he feared that D.L.S. would be upset with him because he had "allowed someone else to use the car," he essentially confirmed D.L.S.'s testimony; why would Hansen fear that D.L.S. would become upset by his allowing Sands to use the car if D.L.S. had given Sands permission to use the car? The lack of any direct permission by D.L.S. allowing Sands to use the car on April 16, and the lack of any history of any indirect permission by D.L.S. through Hansen allowing *anyone* (including Sands) to use the car, precludes any reasonable hypothesis that Sands inferred from Hansen's conduct that D.L.S. authorized Hansen to permit Sands's use. This is so whether or not Hansen handed D.L.S. the keys on April 16. On these circumstances, Sands had no reason to believe that *he* had D.L.S.'s consent to use her car.

Sands insists that we not count Hansen's text messages and statements to police as anything more than prior inconsistent statements for impeachment, and not as substantive evidence about Sands's taking the car without Hansen's permission. Even so, the

circumstances proved still show that D.L.S. never directly or indirectly gave Sands permission to drive her car, and that Sands drove the car, wrecked the car, and failed to return the car. The evidence supporting the circumstances favoring the guilty verdict is certainly not overwhelming, and this is a close case. But given our reliance on the circumstances proved, which we necessarily infer from the jury's guilty verdict and the evidence presented, we conclude that the circumstances do not support the innocent hypothesis that Sands offers.

**Affirmed.**